628 F.2d 297
 Jack RHEUARK, John D. Doescher and Robert Allen Jordan,
Plaintiffs-Appellees, Cross-Appellants,
v.
Bill SHAW, Clerk of Dallas County Courts, et al., Defendants,
County of Dallas Texas et al., Defendants-Appellants, Cross-Appellees.
 No. 79-3213.
 United States Court of Appeals,
Fifth Circuit.
 Sept. 24, 1980.
 
 Earl Luna, Dallas, Tex., Iris Jean Jones, Asst. Atty. Gen., Austin, Tex., for defendants-appellants, cross-appellees.
 Charles J. Baldree, Asst. Dist. Atty., Dallas, Tex., for Bastas.
 Vincent W. Perini, Elizabeth Unger Carlyle, Dallas, Tex., for Rheuark.
 Allen, Knuths, Cassell & Short, Tedford E. Kimbell, Dallas, Tex., for Doescher.
 Thompson & Knight, Molly Steele Bishop, Dallas, Tex., for Jordan.
 Appeals from the United States District Court for the Northern District of Texas.
 Before RUBIN, HENDERSON and REAVLEY, Circuit Judges.
 REAVLEY, Circuit Judge:
 
 
 1
 Jack Rheuark, John Doescher and Robert Jordan were convicted in a Texas state court of various criminal offenses. They each sought to appeal their convictions to the Texas Court of Criminal Appeals, but were frustrated in their endeavors to do so by an inordinate delay in the transcription of the testimony and proceedings of their trials by the court reporter. Rheuark, Doescher and Jordan each filed suit under 42 U.S.C. § 1983 against the court reporter, the state court trial judge, the county in which they were tried and the commissioners thereof, alleging that they were entitled to damages and injunctive relief because the delay in the preparation of their trial records constituted a violation of their constitutional rights to a speedy appeal and due process.
 
 
 2
 After a bench trial, the district court held that the delay violated their constitutional due process rights on appeal and awarded Rheuark and Doescher $1.00 nominal damages and Jordan $3,000 actual damages. Because the court held each individual defendant was entitled to either absolute or qualified immunity, only Dallas County was held liable for damages. The county's liability was predicated on a holding that the actions of the county commissioners constituted a policy or custom of the county which violated appellees' constitutional rights. The district court also awarded attorneys' fees to be taxed against the county. See Rheuark v. Shaw, 477 F.Supp. 897 (N.D.Tex. 1979). Each party appeals that part of the district court's decision adverse to him or it.
 
 
 3
 Appellants present three issues. First, whether the passage of a substantial length of time between conviction and appeal, caused by a prodigious delay in the transcription and preparation of a criminal defendant's trial record, constitutes a denial of due process. Second, whether under the circumstances of this case these individual defendants are clothed with either absolute or qualified immunity due to their respective official capacities. Third, whether a policy or custom of Dallas County existed which violated appellees' constitutional rights, thus rendering the county liable in a § 1983 suit consistent with Monell v. New York City Department of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). We agree with the district court's finding of immunity for the individual defendants. However, because we conclude that the district court erred in holding Dallas County liable since the sine qua non of Monell was not satisfied, it is unnecessary for us to decide the first issue. Therefore, we affirm in part and reverse in part, deciding that plaintiffs may not recover from any of the defendants.[1]
 
 I.
 
 4
 The factual details are fully set out in the district court's opinion. Rheuark v. Shaw, 477 F.Supp. 897 (N.D.Tex. 1979). The following facts are significant for purposes of this appeal.
 
 
 5
 Rheuark, Doescher and Jordan were all convicted for various criminal offenses in Criminal District Court No. 2 in Dallas, Texas during 1975 and 1976. The same judge, Judge Metcalfe, presided over each of their trials, and the same official court reporter took shorthand notes in their trials for the purpose of making a verbatim record of the proceedings. After being convicted, each gave timely notice of appeal by filing a pauper's oath which requested the judge to appoint counsel for appeal and to order the court reporter to prepare a statement of facts[2] free of charge. In Rheuark's case, 23 months, 11 days elapsed between the time the judge ordered the statement of facts to be prepared and the actual preparation thereof. The elapsed time between the judge ordering Doescher's and Jordan's statements of facts to be prepared and their actual preparation was 20 months and nine months, respectively.
 
 
 6
 Since 1965, Texas law has required that in the appeal of a criminal conviction the statement of facts shall be completed and filed with the trial court clerk for inclusion in the record within 90 days of the filing of notice of appeal. Tex.Code Crim.Proc.Ann. art. 40.09, § 3 (Vernon 1979). Until May 25, 1977, the trial court had the power, upon good cause shown, "to extend for as many times as deemed necessary the time for preparation and filing of the transcription (of the statement of facts), and the approval of the record after the expiration of the time provided by law for its approval shall be sufficient proof that the time for filing and transcription was properly extended, . . . ." Id.[3]
 
 
 7
 Neither Rheuark, Doescher or Jordan requested an extension for the preparation of their statements of facts by the court reporter, nor did the trial court extend the time for preparation of their statements of facts. Indeed, all three sent numerous letters to judges and other court personnel in order to secure their respective statements of facts. In addition, Rheuark filed several habeas corpus petitions in various state and federal courts. These courts either ignored his pleas, responded by claiming a lack of jurisdiction, or explained that they were unable to expedite the preparation of his statement of facts.
 
 
 8
 Under Texas law, each district and criminal district judge is responsible for the appointment of an official court reporter. Tex.Rev.Civ.Stat.Ann. art. 2321 (Vernon 1971 & Supp. 1980). These judges also possess discretionary authority to appoint an unlimited number of deputy court reporters when illness or disability of the official court reporter or the press of official work requires. Tex.Rev.Civ.Stat.Ann. art. 2323 (Vernon 1971).
 
 
 9
 In January of 1973, Judge Metcalfe became the judge of the Criminal District Court No. 2. It was stipulated that when he took office a serious backlog of pending appeals existed. Indeed, the official court reporter was still working on statements of facts for appeals in some cases that had been tried in 1971. At this time, the court reporter had approximately 15 statements of facts to prepare for appeals which were already over the 90 day time limit prescribed by statute. After an informal audit in September, 1973 that discovered an additional 30 to 35 cases on appeal about which the official court reporter previously had been unaware,[4] Judge Metcalfe realized that his court reporter had a sizable backlog of statements of facts to dictate. In response to this problem, the judge hired substitute or deputy court reporters to take notes on trials so that his official court reporter could catch up on his backlog of appeals awaiting transcription. However, substitute court reporters were only used in court for four months each year from 1974 to 1976. Since the time lag in preparing statements of facts for appeals had not been reduced, Judge Metcalfe in late 1976 finally hired a substitute court reporter for at least nine months to enable his official court reporter to eliminate the backlog of appeals. Even during this time, the judge used his official court reporter to perform certain nonstatutory duties, including the preparation of criminal charges, which took the reporter away from dictating appeals for one to three hours per charge.
 
 
 10
 Although district judges in Texas possess absolute discretionary power to hire as many substitute court reporters as they deem necessary, the commissioners court[5] of the county in which a judge sits is charged with responsibility for paying the salaries of official and substitute court reporters and their fees for the preparation of statements of facts for indigents. See Tex.Rev.Civ.Stat.Ann. arts. 2323, 2326o, 3912k, § 3(a) (Vernon 1971 & Supp. 1980); Tex.Code Crim.Proc. art. 40.09, § 5 (Vernon 1979).
 
 
 11
 Some individual members of the commissioners court of Dallas County testified that they were generally aware of the problems the official court reporters were having with appellate backlogs and that substitute court reporters were being used to alleviate these problems.[6] For several years, the commissioners court expressed concern about rapidly expanding budget expenditures for substitute court reporters. This was an especially irksome problem for the commissioners because they lacked budgetary control over the amount of county funds spent, but nevertheless had to pay the bills when they came due. The amount the commissioners budgeted for substitute court reporters was consistently exceeded in 1975, 1976, and 1977.[7]
 
 
 12
 When the yearly budget for substitute court reporters was exceeded, the county auditor would request the commissioners to make a transfer of funds from unallocated revenue to pay bills submitted by the court reporters. This was necessary because the auditor could not legally pay funds from the county treasury unless there had been an appropriation in the budget. Towards the end of 1976 after the budget had been exceeded, there were some instances when payments to substitute court reporters were delayed, a few for over a month. Some commissioners expressed a reluctance to appropriate funds to pay substitute court reporters' bills that had been incurred. Nonetheless, the commissioners never refused to pay substitute reporters hired by the district judges.
 
 
 13
 In 1975, the commissioners, objecting to the open-ended nature of the district judges' requests, sent a letter to the judges asking them to curtail the appointment of additional court reporters. Moreover, on December 8, 1976, the commissioners wrote a letter to all judges of courts of record in Dallas County advising them that prior approval had to be obtained from the commissioners court for additional court reporters. Although the commissioners knew that they lacked authority to require district judges to obtain advance clearance before hiring additional court reporters, the letter was sent in an effort to get the judges to reduce expenditures for substitute reporters. Judge Metcalfe testified that upon receiving this letter he telephoned the commissioners' attorney and gave notice that he would not clear requests for additional court reporters with the commissioners since they lacked authority to order this type of prior approval.
 
 II.
 
 14
 The Constitution does not require the states to afford a right to appellate review of a criminal conviction. Ross v. Moffitt, 417 U.S. 600, 611, 94 S.Ct. 2437, 2444, 41 L.Ed.2d 341 (1974); Ortwein v. Schwab, 410 U.S. 656, 660, 93 S.Ct. 1172, 1174, 35 L.Ed.2d 572 (1973); Griffin v. Illinois, 351 U.S. 12, 18, 76 S.Ct. 585, 590, 100 L.Ed. 891 (1956); McKane v. Durston, 153 U.S. 684, 687, 14 S.Ct. 913, 914, 38 L.Ed.2d 867 (1894). Nevertheless, when a state provides a right to appeal, it must meet the requirements of due process and equal protection. Douglas v. California, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963); Griffin v. Illinois, 351 U.S. at 18, 76 S.Ct. at 590; Pate v. Holman, 341 F.2d 764, 770, 773 n.10 (5th Cir. 1965). We are convinced that due process can be denied by any substantial retardation of the appellate process, including an excessive delay in the furnishing of a transcription of testimony necessary for completion of an appellate record. See Rheuark v. Shaw, 547 F.2d 1257 (5th Cir. 1977); McLallen v. Henderson, 492 F.2d 1298 (8th Cir. 1974); Rivera v. Concepcion, 469 F.2d 17 (1st Cir. 1972); Tramel v. Idaho, 459 F.2d 57 (10th Cir. 1972); Odsen v. Moore, 445 F.2d 806 (1st Cir. 1971); Dixon v. Florida, 388 F.2d 424 (5th Cir. 1968); Jones v. Crouse, 360 F.2d 157 (10th Cir. 1966); Smith v. Kansas, 356 F.2d 654 (10th Cir. 1966); Colunga v. State, 527 S.W.2d 285, 288 (Tex.Cr.App. 1975); see also Roberson v. Connecticut, 501 F.2d 305, 310 (2d Cir. 1974) (Mansfield, J., concurring and dissenting).
 
 
 15
 Therefore, we assume without deciding the issue that, at least in Rheuark's case, a delay of nearly two years from notice of appeal to the date when his statement of facts was finally prepared exceeds the limits of due process. However, in making the assumption, we add this caveat: not every delay in the appeal of a case, even an inordinate one, violates due process. We conclude that an ad hoc evaluation of the four factors set forth in Barker v. Wingo, 407 U.S. 514, 530, 92 S.Ct. 2182, 2191, 33 L.Ed.2d 101 (1972)[8] is appealing as means to determine whether a denial of due process has been occasioned in any given case.
 
 
 16
 The factors of Barker are preferred here in preference to the standard announced in United States v. Lovasco, 431 U.S. 783, 97 S.Ct. 2044, 52 L.Ed.2d 572 (1977),[9] since the reasons for constraining appellate delay are analogous to the motives underpinning the Sixth Amendment right to a speedy trial.[10] Criminal appellants often languish in prison or jail, "vegetating" while they await the outcome of their appeals.[11] If fortunate enough to be on bail while their cases are appealed, the truly guilty walk the streets of our communities months and even years after their convictions free to commit other crimes. Reese v. State, 481 S.W.2d 841, 843 (Tex.Cr.App. 1972). Moreover, if an appeal is not frivolous, a person convicted of a crime may be receiving punishment the effects of which can never be completely reversed or living under the opprobrium of guilt when he or she has not been properly proven guilty and may indeed be innocent under the law. In our judgment, such results cannot be tolerated. The cancerous malady of delay, which haunts our judicial system by postponing the rectification of wrong and the vindication of those unjustly convicted, must be excised from the judicial process at every stage.
 
 III.
 
 17
 We agree with the district court's decision in this case that Judge Metcalfe enjoyed absolute judicial immunity and that his official court reporter was entitled to qualified immunity.[12]
 
 
 18
 With respect to Judge Metcalfe, it is well settled that a "judge is absolutely immune from liability for his judicial acts even if his exercise of authority is flawed by the commission of grave procedural errors." Stump v. Sparkman, 435 U.S. 349, 359, 98 S.Ct. 1099, 1106, 55 L.Ed.2d 331 (1978). Moreover, a judge cannot "be deprived of immunity because the action (or inaction) he took (or did not take) was in error, was done maliciously, or was in excess of his authority; rather, he will be subject to liability only when he has acted in 'clear absence of all jurisdiction.' " Id. at 356-57, 98 S.Ct. at 1105. This doctrine of immunity extends to § 1983 suits. Id.; Pierson v. Ray, 386 U.S. 547, 87 S.Ct. 1213, 18 L.Ed.2d 288 (1967).
 
 
 19
 Appellees contend that Judge Metcalfe's failure to appoint a sufficient number of substitute court reporters to alleviate the backlog of statements of facts in his court was simple neglect of a ministerial duty and, hence, not a "judicial act" for which he would enjoy absolute immunity. We disagree. In determining whether a particular act is a "judicial" one, we must consider two factors: (1) "whether it is a function normally performed by a judge," and (2) "whether (the parties) dealt with the judge in his judicial capacity." Stump, 435 U.S. at 362, 98 S.Ct. at 1107.
 
 
 20
 In Slavin v. Curry, 574 F.2d 1256, 1263-64, modified on other grounds, 583 F.2d 779 (5th Cir. 1978), we held that under Texas law the supervision of court reporters is a judicial function and that a judge is absolutely immune from liability under § 1983 for conduct arising from such supervision. Here Judge Metcalfe was vested with jurisdictional authority to appoint and supervise court reporters. Tex.Rev.Civ.Stat.Ann. arts. 2321, 2323 (Vernon 1971); Tex.Code Crim.Pro. art. 40.09, § 5 (Vernon 1979). Moreover, the parties dealt with him as a judge when they requested that he order their statements of facts prepared and when they made subsequent inquiries about the status of their appeals. Therefore, we hold Judge Metcalfe to be absolutely immune from damages in these suits.
 
 
 21
 Turning now to the official court reporter, we conclude that he is also immune from any liability herein under § 1983. In Slavin v. Curry, we held that official court reporters are entitled to qualified immunity under § 1983 if "they 'can show that (they were) acting pursuant to (their) lawful authority and following in good faith the instructions or rules of the Court and (were) not in derogation of those instructions or rules.' " 574 F.2d at 1265-66 (brackets in original), quoting McLallen v. Henderson, 492 F.2d 1298, 1300 (8th Cir. 1974). The district court found that the official court reporter at all times relevant to these suits acted pursuant to his statutory authority and followed the instructions of Judge Metcalfe in good faith. After reviewing the record, we cannot say that the district court's finding of good faith on the part of the court reporter was clearly erroneous.[13]
 
 IV.
 
 22
 The district court found that Dallas County, by the actions of its commissioners court, had established "a policy of attempting to curtail the budget for court reporters, . . . which was in conflict with the scope of their powers and which jeopardized the constitutional rights of these plaintiffs . . . seeking appellate review of their convictions," and that "(t)his policy was a proximate cause of the delay experienced by . . . plaintiffs in obtaining their statements of fact, (sic) . . .." Rheuark, 477 F.Supp. at 915. We hold this latter finding regarding causation to be clearly erroneous.
 
 
 23
 In Monell v. Department of Social Services of the City of New York, 436 U.S. 658, 98 S.Ct. 2018, 2036, 56 L.Ed.2d 611 (1978), the Court held that local governments "can be sued directly under § 1983 for monetary, declaratory, or injunctive relief where . . . the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." In order for a governmental unit to be liable under § 1983, the policy or custom must, however, by the very terms of the statute, be a proximate cause of the constitutional violation.[14] Although the members of the commissioners court may have attempted to hold down spending for court reporters, their actions do not constitute a cause in fact of the delay in preparing appellees' statements of facts for appeal.
 
 
 24
 Although the commissioners court is charged with the responsibility of paying court reporters' salaries and their fees for preparing statements of facts for indigents, each district judge possesses absolute authority to appoint an unlimited number of substitute court reporters as need requires[15] and to compel the county to pay their salaries and fees.[16] The party primarily at fault here is Judge Metcalfe; it is he who must bear ultimate responsibility for the unconscionable delay in the preparation of appellees' statements of facts.[17] He had at his disposal the legal means to eliminate the backlog of statements of facts awaiting preparation, but "did not fully utilize his power to appoint additional court reporters until nearly four years after he assumed the bench . . .."[18] Rheuark, 477 F.Supp. at 911-912.
 
 
 25
 The district court attaches great significance to the fact that the budgeted amounts for extra court reporters was consistently exceeded in 1975, 1976, and 1977. However, as the court found, no one judge has responsibility for all court reporters in Dallas County. It was impossible for the commissioners court to accurately estimate the next year's budget for court reporters, since the trial judges did not submit estimates as to their appointments of extra court reporters for the following year. Moreover, there is no evidence that the commissioners court ever refused to appropriate funds to pay any extra court reporters once budget overruns occurred toward the ends of these years. Although authorization of payments for extra court reporters was delayed late in 1976[19] for some individual reporters it was a little over a month the funds were eventually appropriated from unallocated reserve, and the reporters were paid in early 1977. In view of these facts and Judge Metcalfe's legal authority to compel the commissioners court to pay for extra court reporters, it cannot be said that the budget overruns amounted to a cause in fact of the delay in preparation of appellees' statements of facts.
 
 
 26
 The district court also emphasizes the importance of the letter of December 8, 1976, in which the commissioners advised the judges to obtain prior approval before appointing additional court reporters. However, upon receiving this letter, Judge Metcalfe notified the commissioners that he would not comply with the request since they lacked legal authority to require this type of prior approval.[20] The letter subsequently written by Judge Metcalfe to the county judge explaining that he anticipated a budget overrun for extra court reporters does not demonstrate a "chilling effect," the kind that would inhibit him from carrying out his responsibility as a trial judge to ensure that statements of facts are timely prepared in accordance with the Texas Code of Criminal Procedure.
 
 
 27
 None of the foregoing is sufficient to establish the commissioners' conduct as a cause in fact of the great delay experienced by appellees in obtaining their statements of facts for appeal. Therefore, appellees are not entitled to recover damages under § 1983 from any defendant.
 
 AFFIRMED in part and REVERSED in part.[21]
 
 
 [1]
 Appellants also assigned error to the district court's award of attorney's fees taxable against the individual defendants in their official capacities, despite the fact that they were found to enjoy immunity from liability. Since appellees are not prevailing parties, we need not address the issue. Nonetheless, we recognize that the Supreme Court's recent decision in Supreme Court of Virginia v. Consumers Union of United States, --- U.S. ----, 100 S.Ct. 1967, 64 L.Ed.2d 641 (1980), would resolve the issue in the appellants' favor
 Appellees might be able to argue that they are prevailing parties to some extent, and thus entitled to attorneys' fees, if they could establish that the bringing of these § 1983 suits somehow prompted Judge Metcalfe and his official court reporter to cause their statements of facts to be prepared in an accelerated manner. The fact that their statements of facts were not prepared until after these suits were filed would support this argument. However, the statements of facts were completed before any of the appellees' attorneys were appointed. Thus it cannot be said that any attorneys' fees were incurred for the purpose of actually obtaining the statements of facts. The record shows that attorneys' fees were incurred in an effort to recover damages under § 1983. Consistent with this discussion, appellee Rheuark might be considered a prevailing party. However, we agree with the district court and its reasoning that Congress intended 42 U.S.C. § 1988 to compensate attorneys not pro se litigants. Rheuark, 477 F.Supp. at 928-29; see Gore v. Turner, 563 F.2d 159, 164 (5th Cir. 1977) (existence of attorney-client relationship is all that is required to recover under § 1988).
 
 
 [2]
 Two components comprise the record on appeal in the Texas Court of Criminal Appeals: a "transcript" containing all the pleadings, motions, orders, and other court papers for the case, and a "statement of facts" consisting of a transcription of the court reporter's notes taken at the trial
 
 
 [3]
 In 1977, the Texas Code of Criminal Procedure was amended to transfer from the trial court to the Court of Criminal Appeals the authority to grant extensions of time for the preparation of the statement of facts. Tex.Code Crim.Proc.Ann. art. 40.09, § 16 (Vernon 1979)
 
 
 [4]
 Judge Metcalfe, his court reporter, and the court clerk conducted the audit. Case files were discovered behind filing cabinets, etc.; the pauper's oath forms in the files had never been given to the court reporter
 
 
 [5]
 The commissioners court, consisting of the county judge and four county commissioners, is the governing and administrative body of a county in Texas. It has the power to determine the county budget and make appropriations of funds. See Tex.Const. art. 5, § 18; Tex.Rev.Civ.Stat.Ann. art. 2351 (Vernon 1971); Avery v. Midland County, Texas, 390 U.S. 474, 476-77 (1968)
 
 
 [6]
 One commissioner testified that there had been a problem with delay on appeals since 1965, as long as he had been in office. Some of the commissioners also stated they knew that appellate statements of facts took as long as two years to prepare and that over 50% of requests for substitute court reporters were to help relieve this problem
 
 
 [7]
 The overrun for 1975 was $12,880.00; it was $8,048.06 in 1976; and for 1977 it amounted to $48,819.94
 
 
 [8]
 These four factors are the "(l)ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant." 407 U.S. at 530, 92 S.Ct. at 2191. With respect to the factor of prejudice, the Court indicated that "it should be assessed in light of the interests of defendants which the speedy trial right was designed to protect." Id. at 532, 92 S.Ct. at 2192. Three such interests were identified: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the accused's defense might be impaired. Id
 In the case of appellate delay, prejudice should be assessed in light of the interests of those convicted of crimes to an appeal of their convictions unencumbered by excessive delay. We identify three similar interests for prompt appeals: (1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, and his or her defenses in case of reversal and retrial, might be impaired. As an example demonstrating that a ground of appeal can be impaired by delay, the record shows that in a related § 1983 suit consolidated with appellees' cases, which was settled before going to trial, the plaintiff therein alleged that the delay in preparation of his statement of facts caused the court reporter not Judge Metcalfe's to make a crucial mistake in his transcription by omitting defense counsel's oral motion for mistrial. On appeal, the Texas Court of Criminal Appeals declined to rule on the issue because there was no motion for mistrial reflected in the record, even though the trial judge was recorded as saying, "I will overrule your objection for a mistrial." This type of mistake is consistent with the testimony of Judge Metcalfe's official court reporter that it is more difficult for him to read his shorthand notes of a trial after they have become 8 months to a year old, rather than if he had dictated them earlier.
 Moreover, prejudice to a defendant is clearly present when, after a substantial delay in awaiting an appeal, his conviction is reversed and the state is allowed to retry him, since during the delay witnesses or other evidence may no longer be available. In such a case, we are inclined to believe that a consideration of the Sixth Amendment speedy trial right in its most pristine sense would be triggered by any retrial of such a person. The consideration would, of course, be an ad hoc determination based on the four factors of Barker.
 
 
 [9]
 The Court held that with respect to delay prior to indictment or actual restraint imposed by arrest and being held to answer a criminal charge, "the Due Process Clause has a limited role to play in protecting against oppressive delay." 431 U.S. at 789, 97 S.Ct. at 2048. It is also significant that the Court noted statutes of limitations provide predictable, legislatively enacted limits on preindictment delay. Id. There are no legislatively enacted limits on appellate delay which are analogous to statutes of limitations in purpose or effect
 
 
 [10]
 See, e. g., Williams v. United States, 250 F.2d 19 (D.C.Cir. 1957); see also, Christian, Delay in Criminal Appeals: A Functional Analysis of One Court's Work, 23 Stan.L.Rev. 676 (1971), in which the author commented as follows:
 "Avoidable delay in deciding criminal appeals is costly to society and detrimental to the aims of the judicial system. Delay in affirming a judgment of conviction may decrease the conviction's deterrent value, as well as frustrate rehabilitation. Delay in reversing a judgment of conviction allows evidence to grow stale, thereby threatening the validity of a new trial as a factfinding process. If reversal is followed by the acquittal of the appellant, each day of appellate delay will have been a day of unjust punishment. Yet delay has become a prominent characteristic of the American appellate process and a growing threat to the effective administration of justice."
 See also, Southern Pacific Transportation Co. v. Stoot, 530 S.W.2d 930, 931 (Tex.1975), in which this writer made the following statement regarding the problems of delay in our judicial system:
 Delay haunts the administration of justice. It postpones the rectification of wrong and the vindication of the unjustly accused. It crowds the dockets of the courts, increasing the costs for all litigants, pressuring judges to take short cuts, interfering with the prompt and deliberate disposition of those causes in which all parties are diligent and prepared for trial, and overhanging the entire process with the pall of disorganization and insolubility. But even these are not the worst of what delay does. The most erratic gear in the justice machinery is at the place of fact finding, and possibilities for error multiply rapidly as time elapses between the original fact and its judicial determination.
 
 
 [11]
 See, e. g., Guyton v. State, 472 S.W.2d 130 (Tex.Cr.App. 1971) (record did not reach the appellate court until over 5 years after trial, and appellant was ineligible for bail, having received a life sentence); Dues v. State, 456 S.W.2d 116 (Tex.Cr.App. 1970) (appellant was confined in jail 31/2 years from the end of his trial until the record reached the appellate court, which reversed his conviction); Alexander v. State, 450 S.W.2d 70 (Tex.Cr.App. 1970) (record did not reach appellate court until 43 months after trial, it taking 3 years, 9 days to complete the statement of facts); Curtis v. State, 450 S.W.2d 634 (Tex.Cr.App. 1970) (43 months for record to reach appellate court); Lacy v. State, 450 S.W.2d 640 (Tex.Cr.App. 1970) (37 months for record to reach appellate court); Marshall v. State, 444 S.W.2d 928 (Tex.Cr.App. 1969) (38 months delay between end of trial and completion of record)
 
 
 [12]
 Since we decide that Dallas County is not liable in these § 1983 suits under Monell (see part IV of this opinion), we need not decide whether the members of the commissioners court enjoy absolute immunity under § 1983 for their "legislative acts." Nonetheless, we are persuaded that the district court was correct in affording the commissioners such immunity. See Lake County Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979) (note Marshall, J., dissenting); Gorman Towers, Inc. v. Bogoslavsky, 626 F.2d 607 (8th Cir. 1980). We express no opinion concerning the district court's conclusion that the commissioners were not entitled to qualified immunity since their conduct lacked good faith. Rheuark, 477 F.Supp. at 924
 
 
 [13]
 Although the court reporter knew about the 90 day time limit prescribed by statute for the preparation of statements of facts, he also knew that the law allowed the trial judge to grant extensions and that if the judge approved the record after the 90 day limit, it would be presumed to be timely filed in the Court of Criminal Appeals. Moreover, the court reporter was not a lawyer and could not be expected to know that a tardily prepared statement of facts could constitute a denial of due process. The record also clearly shows that the reporter did not discriminate against any of the appellees in the preparation of their statements of facts. He worked on a first-in/first-out basis, preparing the oldest first and working forward in a chronological order. We cannot charge the court reporter with responsibility for the harm suffered by appellees since he could do the work of only one person. The record does indicate, however, that he could have better informed Judge Metcalfe of the tremendous backlog in 1973 and should have requested that the judge appoint a greater number of substitute court reporters from 1973 to 1976
 
 
 [14]
 See, e. g., Anderson v. Nosser, 456 F.2d 835, 841 (5th Cir.) (en banc), cert. denied, 409 U.S. 848, 93 S.Ct. 53, 34 L.Ed.2d 89 (1972). 42 U.S.C. § 1983 provides in pertinent part:
 "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured . . .." (emphasis added).
 
 
 [15]
 Tex.Rev.Civ.Stat.Ann. art. 2323 (Vernon 1971)
 
 
 [16]
 The payment of court reporters' salaries is a ministerial function, see Tex.Rev.Civ.Stat.Ann. arts. 2326o, § 2, 3912k, § 3 (Vernon 1971 & Supp. 1980), as is payment of fees for transcription of indigents' statements of facts, Tex.Code Crim.Proc. art. 40.09, § 5 (Vernon 1979). Therefore, mandamus will lie under Tex.Rev.Civ.Stat.Ann. art. 1914 (Vernon 1964), thus enabling district judges to compel commissioners courts to pay the salaries and fees of substitute court reporters. See, Wichita County v. Griffin, 284 S.W.2d 253 (Tex.Civ.App. Fort Worth 1955, writ ref'd n. r. e.)
 
 
 [17]
 In one of the many hearings conducted by the district court in these consolidated suits, Judge Metcalfe testified that once a case is appealed "if the (trial) Judge, does not ride herd, so to speak, on that appeal nobody else does with some exceptions like Mr. Rheuark, for instance, but for the most part it's the Judge that has prime responsibility." We agree and wish to admonish all trial judges in this circuit to conscientiously discharge their responsibilities in this regard. We also concur in the statement, about which Judge Metcalfe knew or should have known, in Reese v. State, 481 S.W.2d 841, 843 (Tex.Cr.App. 1972): "An alarm should be sounded to all trial judges so that all possible steps to speed up the appellate process can be taken."
 
 
 [18]
 Judge Metcalfe testified as follows:
 Q If you had more court reporters available, that would alleviate the situation?
 A (Judge Metcalfe) Absolutely.
 Q Are there problems involving budgeting or financing?
 A (Judge Metcalfe) Legally, no. I have authority in statute to get all the substitute reporters I need. As a practical matter, and I have tried to hold that to a minimum of I guess because I'm just basically a conservative person who doesn't like to be a free spender with the public's money.
 Judge Metcalfe's failure to affirmatively act to correct the problem is especially grievous since he should have known about the decisions in Colugna v. State, 527 S.W.2d 285 (Tex.Cr.App. 1975); Zanders v. State, 515 S.W.2d 907 (Tex.Cr.App. 1974); Cunningham v. State, 484 S.W.2d 906 (Tex.Cr.App. 1972), in which the Court of Criminal Appeals indicated that an excessive delay in preparation of a criminal appellant's statement of facts could constitute a denial of due process. See also, Guillory v. State, 557 S.W.2d 118 (Tex.Cr.App. 1977) (trial judge's authority to compel a court reporter to complete the statement of facts).
 
 
 [19]
 The county judge, who acts as chairman of the commissioners court, testified that he thought he recalled a majority of the commissioners voting to delay authorization of payments to extra court reporters in late 1976. However, the minutes of the commissioners court meetings contain not one rejection of a request to transfer funds to pay substitute court reporters; they actually reflect that there were two approvals in December, 1976 to transfer funds to pay all extra court reporters' bills for that year. PXs 9-11, 26-32
 
 
 [20]
 The record is not clear, but the commissioners may have had the authority to require such prior approval from county judges, as opposed to district judges. The letter was addressed to all judges of courts of record in Dallas County. This includes county judges
 
 
 [21]
 Although it appears that we have left future plaintiffs like Rheuark, Doescher and Jordan without a remedy under § 1983 at least in the absence of bad faith on the part of the court reporter or a demonstration of causation with respect to an official policy or custom of the county it should be remembered that under amended Art. 40.09, the Court of Criminal Appeals must grant any extension for preparation of the appellate record, which may be done only "for good cause shown." Tex.Code Crim.Proc. art. 40.09, § 16 (Vernon 1979). Also a person in such a predicament can seek federal habeas corpus review without exhausting state remedies if after conviction he or she has endeavored, unsuccessfully, to obtain appellate review because his or her statement of facts remains uncompleted after the passage of a substantial length of time. Rheuark v. Wade, 540 F.2d 1283 (5th Cir. 1976); Dixon v. Florida, 388 F.2d 424 (5th Cir. 1968)