**Randy WHEELER, Petitioner,**

v.

**Walter KELLY, Superintendent of the Attica Correctional Facility, Respondent.**

**No. CV 86–0197.**

United States District Court, E.D. New York.

July 21, 1986.

E. Thomas Boyle, Smithtown, N.Y., for petitioner.

Denis Dillon, Nassau County Dist. Atty. by Bruce Whitney, Asst. Dist. Atty., Mineola, N.Y., for respondent.

## MEMORANDUM AND ORDER

WEXLER, District Judge.

Petitioner Randy Wheeler, an inmate at the Attica Correctional Facility in Attica, New York filed this petition for a writ of habeas corpus, 28 U.S.C. § 2254, claiming that the failure to decide the appeal of his criminal conviction within five years of sentencing violates the Due Process clause of the Fourteenth Amendment to the United States Constitution. For the reasons stated below, the writ is granted.

### I.

On April 30, 1981, Petitioner Randy Wheeler was sentenced in County Court, County of Nassau, to an indeterminate term of imprisonment of twenty years to life for the felony murder of Ralph Parcelli. Petitioner was incarcerated and filed a timely notice of appeal. Within a week of the sentencing, petitioner requested that the Appellate Division of the New York State Supreme Court, Second Judicial Department (the Appellate Division or Second Department) assign William Sullivan, a sole practitioner in Ithaca, New York, to represent petitioner on his appeal. Sullivan, who had been the District Attorney of Tompkins County, New York from 1972 to 1975, was not on the list of attorneys permitted to accept appeals in the Second Department. Sullivan wrote Irving Selkin, then Clerk of the Appellate Division, indicating that he would accept such an assignment, in part because he was representing Wheeler on another criminal matter then pending in the Third Department. In June 1981, Sullivan was assigned to represent petitioner on the appeal. Sullivan made several requests for the trial transcripts and, on November 29, 1981, they were sent to him.

Petitioner then attempted to stay in close communication with Sullivan concerning the progress of the appeal. Throughout the balance of 1981 and during 1982 and 1983, petitioner wrote to Sullivan at least twelve times, inquiring about the status of the appeal. Sullivan responded to some of the letters but it appears that, beginning sometime during 1982, he ceased working actively on the appeal due to severe administrative problems. Sullivan had difficulty retaining secretarial and clerical employees on more than a temporary basis and, for up to eight or ten months at a time, his office was unstaffed. Large quantities of mail went unopened and quite often, correspondence was opened and filed without Sullivan's knowledge. During this time, Sullivan made little or no progress on his client's appeal despite the lawyer's representations that the brief was nearly finished.

As time passed and the appeal was not perfected, petitioner grew impatient with his attorney and, in early 1984, he wrote Sullivan to tell him that he was prepared to ask the Appellate Division to look into the delay. Apparently, Sullivan's response, if any, was not to petitioner's satisfaction, because on August 3, 1984, petitioner wrote the Clerk of the Appellate Division, asking for assistance in connection with the appeal. On August 10, 1984, Arnold Edman, Deputy Clerk of the Appellate Division, wrote Sullivan, asking why the appeal had not yet been perfected. Sullivan did not respond and on October 5, 1984, Deputy Clerk Edman again wrote Sullivan, this time instructing him to comply with the earlier request. Sullivan did not respond to this letter either. Apparently, both letters from the Appellate Division remained unopened in Sullivan's office for some period of time.

On November 14, 1984, petitioner again wrote the Appellate Division. This letter was treated as a motion for the assignment of new counsel. The District Attorney did not oppose the motion and, on January 15, 1985, the Appellate Division replaced Sullivan with Steven Legum of Mineola, New York. The Order of the Appellate Division did not establish a schedule for perfecting the nearly four-year old appeal but merely directed Sullivan to turn over to Legum all papers in the action.

Throughout 1985 petitioner wrote Legum on several occasions in an attempt to get

the appeal perfected. Legum responded that he was unable to proceed because Sullivan had not yet turned over the trial transcripts or any other papers pertaining to the appeal despite the Appellate Division's Order. Legum attempted to contact Sullivan on several occasions, but other than these attempts to contact Sullivan, however, Legum never sought the court's assistance in obtaining the transcripts.

Two reasons explain Sullivan's failure to comply with this Order. First, as has already been noted, Sullivan was not opening and reviewing his mail as it arrived. Therefore, he was not even aware of the Appellate Division's Order until March or April of 1985, approximately three months after it was issued and sent to his office. Second, once Sullivan learned of the Order, he was unable to turn over the transcripts because he did not have them anymore. Two years earlier, in 1983, he lent them to an Elmira, New York attorney and had made no subsequent effort to retrieve them. It appears that the original minutes may still be in the possession of the Elmira attorney. Legum ultimately obtained a copy of the trial transcripts in January, 1986, shortly after the instant petition was filed.

After Wheeler commenced this action for a writ of habeas corpus, this Court ordered respondent to show cause why a writ should not be granted. After respondent filed papers in opposition to the petition, the Court appointed counsel for the petitioner and directed that a hearing be held to determine the cause of the delay in perfecting petitioner's appeal.

At the hearing, which was held on May 16, 1986, Martin Brownstein, then Acting Clerk of the Appellate Division, revealed that petitioner's appeal is one of several hundred unperfected appeals pending since 1981 and earlier. At about the same time as the 1984 filing of the petition for a writ of habeas corpus in *Harris v. Kuhlman*, 601 F.Supp. 987 (E.D.N.Y.1985) (Weinstein, J.), the Appellate Division began canvassing its unperfected appeals and developing special status calendars, beginning with the older cases. Brownstein admitted that progress in perfecting these appeals has been slow, in part because of inadequate administrative facilities. The records pertaining to each of the thousands of appeals filed annually in the Appellate Division are maintained on small index cards. The Appellate Division does not have a master or consolidated calendar of pending appeals. Other than consulting the index card on an appeal, there is no way to obtain information about a particular case. Because the Appellate Division presently lacks more modern equipment, these records must be updated manually and there is no capability for determining the volume or status of the pending appeals. Therefore, aside from the on going recanvassing effort begun in the fall of 1984, the Appellate Division is unable to determine such matters as the number of pending and unperfected appeals, how long these appeals have been pending or remained unperfected, and the various reasons why appeals have not been processed to completion.

Although the Appellate Division's canvassing efforts have expedited the disposition of many appeals, the entire docket must be reviewed periodically and the canvassing and calendering efforts repeated if calendar control is to be achieved. Brownstein stated that the Appellate Division is now conducting secondary reviews of pre–1983 cases, but because of the volume of unperfected appeals, it is at least a year between the initial canvass of a case and a subsequent recanvass. Because older cases are currently being recanvassed and placed on special status calendars, appeals in which attorneys were assigned in 1983 are only now being reviewed for the first time. 1984 and 1985 appeals have yet to be reviewed. Acting Clerk Brownstein indicated that 1985 appeals should be reached for the first time by the summer of 1986.

The volume of pending, unperfected appeals is simply staggering. Acting Clerk Brownstein's testimony indicated that in April and May of 1985, the Appellate Division had established special status calendars for some 369 unperfected pre–1982 appeals, with some appeals unperfected since 1977. Although the Appellate Division began the task of reviewing the ap-

peals in the fall of 1984, had it not been for the instant petition, the Appellate Division would not have discovered the dormancy of Wheeler's appeal until at least June of 1986.

Ironically, petitioner's attempt to secure new counsel in 1985 may have inadvertantly prevented the Appellate Division from discovering that Wheeler's 1981 appeal was unperfected because the recanvassing effort prioritized cases by the date counsel was assigned, not when the notice of appeal was filed. Therefore, petitioner's efforts to have Sullivan replaced, which resulted in the Appellate Division's 1985 Order assigning Legum, meant that the appeal was considered a 1985 case and not a 1981 counsel. If Wheeler had not sought new counsel, then the pendency of his unperfected appeal might have been discovered in the early months of 1985.

In response to the filing of the instant petition, the Nassau County District Attorney's Office moved the Appellate Division, by way of an Order to Show Cause, to expedite Wheeler's appeal. The Appellate Division then ordered Wheeler to file his brief by May 20, 1986 and set June 10, 1986 for oral argument. It is undisputed that if Wheeler had not sought the assistance of this Court, the District Attorney would not have sought to have the appeal dismissed for want of prosecution. 22 NYCRR § 670.4(b) (McKinney's 1986). The District Attorney's stated policy is that it will not expedite the resolution of an appeal when the defendant is incarcerated.

II.

Federal judges are empowered to grant writs of habeas corpus to provide relief to state prisoners detained in violation of the United States Constitution or other federal law. 28 U.S.C. §§ 2241, 2254(a). The writ of habeas corpus allows a prisoner swift access to the federal court, free from procedural or jurisdictional restraints. *Fay v. Noia,* 372 U.S. 391, 400–02, 83 S.Ct. 822, 828–29, 9 L.Ed.2d 837 (1963); *Frank v. Magnum,* 237 U.S. 309, 346, 35 S.Ct. 582, 595, 59 L.Ed. 969 (1914) (Holmes, J., dissenting); *Codispoti v. Howard,* 589 F.2d 135, 139–40 (3d Cir.1978). In the interest

of federal-state judicial comity, however, the federal habeas statute precludes a court from entertaining the petition if all of the prisoner's claims have not been fully and fairly presented to state courts. 28 U.S.C. § 2254(b). *See also Rose v. Lundy,* 455 U.S. 509, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982) (habeas petition must be denied if it presents exhausted and unexhausted claims); *Picard v. Connor,* 404 U.S. 270, 92 S.Ct. 509, 30 L.Ed.2d 438 (1971) (exhaustion requires that the federal claims be "fairly presented" to the state court). Nevertheless, when exhaustion is futile or state processes are ineffective to protect the rights of defendants, the petition can be considered by the federal court, because the requirement of exhaustion is based on comity, not jurisdiction. *Wilwording v. Swenson,* 404 U.S. 249, 92 S.Ct. 407, 30 L.Ed.2d 418 (1971) (per curiam); *Fay,* 372 U.S. 391, 83 S.Ct. 822; *Marino v. Ragen,* 332 U.S. 561, 564, 68 S.Ct. 240, 242, 92 L.Ed. 170 (1947) (Rutledge, J., concurring); *Shelton v. Heard,* 696 F.2d 1127 (5th Cir. 1983); *Smith v. Kansas,* 356 F.2d 654 (10th Cir.1966), *cert. denied,* 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967). The habeas corpus statute provides specifically that exhaustion is not required if it appears that "there is either an absence of available State corrective process or the existence of circumstances rendering such process ineffective to protect the rights of the prisoner." 28 U.S.C. § 2254(b).

In the case at bar, the second clause of this exception is at issue, namely, whether the process in the Appellate Division can protect the rights of the prisoner effectively. Relying heavily on *Harris,* 601 F.Supp. at 987, petitioner argues that the circumstances in this case evince a denial of due process. Respondent implicitly concedes that petitioner need not exhaust his state court remedies and the failure of assigned counsel to perfect the appeal is chargeable to the state. Respondent argues merely that, in the circumstances of this case, the writ should be denied because the five-year old appeal is now "moving forward" and will be heard shortly by the Appellate Division. This may be true, but it is beyond

contention that an inability to obtain due process on appeal allows the prisoner to turn directly to the federal court for a writ of habeas corpus without having fully exhausted the available state processes. *See, e.g., Shelton,* 696 F.2d 1127; *Codispoti,* 589 F.2d 135; *Sapienza v. Vincent,* 534 F.2d 1007 (2d Cir.1976); *Rivera v. Concepcion,* 469 F.2d 17 (1st Cir.1972); *Smith,* 365 F.2d 654. Moreover, the failure to correct the deficiencies of assigned counsel constitutes state action. *Harris,* 601 F.Supp. at 992. In the instant case, it would be meaningless to insist that petitioner exhaust his state remedies when the essence of his due process claim arises directly out of his inability to do so. Therefore, the Court concludes that state processes are ineffective to protect the rights of the prisoner and that the Court may address the merits of the petition.

### III.

When faced with a substantial delay on the appeal of a criminal conviction, courts have consistently looked to the criteria set forth by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), to determine whether the post-conviction delay constitutes a denial of due process. *See United States v. Johnson,* 732 F.2d 379 (4th Cir.1984); *Rheuark v. Shaw,* 628 F.2d 297, 303 & n. 8 (5th Cir.1980); *Harris,* 601 F.Supp. at 993; *Doescher v. Estelle,* 454 F.Supp. 943, 947 & n. 1 (N.D.Tex.1978). *Barker* involved an alleged violation of the Sixth Amendment's right to a speedy trial. In that case the Court established a balancing test, in which the conduct of the prosecution and the defendant are weighed, and identified four factors to be considered: length of delay; the reason for the delay; the defendant's assertion of his right; and prejudice to the defendant. 407 U.S. at 530, 92 S.Ct. at 2192. "A balancing test necessarily compels courts to approach ... cases on an *ad hoc* basis.... None of the four factors [is] either a necessary or sufficient condition to the finding of a deprivation of the right of speedy trial. Rather, they are related factors and must be considered together with such other circumstances as may be

relevant. In sum, these factors have no talismanic qualities; courts must still engage in a difficult and sensitive balancing process." 407 U.S. at 530, 533; 92 S.Ct. 2191–94. The factors in *Barker* are the preferred method for analyzing post-conviction delay because the reasons for constraining appellate delay are analogous to the motives underpinning the right to a speedy trial. *Rheuark,* 628 F.2d at 303 n. 8. When the issue is delay in the post-trial proceedings, some courts have added federal-state judicial comity as a fifth factor. *United States ex rel. Smith v. Twomey,* 486 F.2d 736 (7th Cir.1973); *Parker v. Texas,* 464 F.2d 572 (5th Cir.1972); *Doescher,* 454 F.Supp. at 947 n. 1.

### A. Was the delay excessive?

Wheeler's notice of appeal was filed over five years ago and is still pending a disposition. Although the Court's research has revealed unfortunate instances of appeals that have remained pending for longer periods, *see, e.g., Codispoti,* 589 F.2d 135 (appeal *sub judice* for twelve years); *Harris,* 601 F.Supp. 987 (appeal unperfected for seven years), respondent states that five years "is concededly of sufficient length to constitute a factor warranting a finding that due process may have been denied." Respondent's Memorandum at 4.

There is no formula for determining if a delay is excessive. Court delay is a blight on the judiciary. It goes without saying that protracted appellate litigation burdens the parties as well as the courts and undermines public confidence in the legal system. *See Rheuark,* 628 F.2d at 303 n. 10 (citing Christian, *Delay in Criminal Appeals: A Functional Analysis of One Court's Work,* 23 Stan.L.Rev. 676 (1971)). Ultimately, the question of whether delay is excessive depends upon the complexity of the litigation, the advocacy of the parties, and the institutional vigilance of the Court. In this case, it appears that the issues are no more complex than found in most criminal appeals. As to the advocacy the parties, however, it is evident that the delay was unwarranted and excessive. Sullivan's apparent abandonment of his

client's appeal not only delayed matters by up to three years when he was Wheeler's attorney but added another year of delay by preventing Legum from proceeding once Sullivan had been relieved. The record also reveals that Legum should have prosecuted the appeal more vigorously. Similarly, the District Attorney's policy of not seeking a dismissal of unperfected appeals in custody cases allowed Sullivan's conduct, and Wheeler's appeal, to go unnoticed and uncorrected. In short, the parties did little to advance the appeal through the Appellate Division.

With respect to the institutional vigilance of the court, before *Harris* the Appellate Division did not review its calendar of older cases in any systematic fashion. Since that time however, the Appellate Division has initiated a review of its older cases and has adopted policies more responsive to the rights of indigent prisoners with unperfected appeals. For example, once Wheeler informed the Appellate Division that the appeal was not being prosecuted, court personnel investigated the matter and the Appellate Division ultimately relieved Sullivan and assigned new counsel. Nevertheless, the Appellate Division's huge caseload, its finite administrative and financial resources, and its difficulties in securing adequate assigned counsel prevented it from discovering the pendency of this appeal until the commencement of the instant petition. Quite clearly, the Appellate Division was unable to exercise institutional vigilance in keeping track of its calendar. Therefore, the Court concludes that in this case, a delay of over five years on the direct appeal of a state criminal conviction was excessive.

The Court is aware of the ruling in *Harris*, that the delay of direct appeal of a conviction exceeding half of the defendant's sentence constitutes prejudicial delay, 601 F.Supp. at 993, but declines to adopt that rule because it would discourage the prompt disposition of appeals for prisoners with longer sentences. The Court does not wish to remove any incentives to the swift disposition of criminal appeals. Although the length of a sentence is a factor in determining whether post-conviction delay is excessive, *Cousart v. Hammock,* 580 F.Supp. 259 (E.D.N.Y.1984), *aff'd,* 745 F.2d 776 (2d Cir.1984) (harms to inmate from appellate delay include anxiety and impairment of defense), the excessiveness of delay should not hinge largely on a prisoner's sentence, particularly when the delay is not caused by the inmate. The length of a defendant's sentence should not discourage a court from rectifying a delay caused by the egregious conduct by counsel. Moreover, timely advocacy and effective calendar control benefits all defendants, regardless of the length of sentence or type of custody. Merely because only one-fourth of this petitioner's sentence has expired does not mean that the state courts should not institute the procedures that speed the resolution of all appeals. Furthermore, *Harris's* rule forces the Appellate Division to concentrate its resources on appeals from defendants with short sentences to the detriment of other appellants. For instance, in the case of prisoners with sentences of twelve to eighteen months, adoption of the rule in *Harris* might result in the premature or rushed consideration of complex appeals. *See, e.g., Jewell v. Berry,* No. 86 Civ. 1691 (E.D.N.Y. Memorandum and Order dated June 9, 1986) (no due process violation when Appellate Division granted adjournment over summer recess to allow District Attorney to respond to inmate's oversized brief).

**B. What was the reason for the delay?**

Sullivan's failure to perfect his client's appeal is the root cause of the delay. Sullivan's utter neglect of the appeal postponed a hearing before the Appellate Division by at least three years. The delay was compounded, however, by the inability of the Appellate Division to keep track of its unperfected appeals. To its credit, the Appellate Division has canvassed its older cases and attempted to expedite appeals through the use of special status calendars. Nevertheless, from the middle of 1981 until the filing of the petition in *Harris,* the Appellate Division did not utilize a dismissal calendar to monitor older appeals. Even after the Appellate Division began to review the pre–1982 cases, it is clear that at least a

year would pass before Wheeler's appeal would have come to their attention.

An important factor contributing to the delay was the Nassau County District Attorney's failure to seek a dismissal of the appeal. A District Attorney has the right to seek dismissal of long-dormant unperfected appeals, 22 N.Y.C.R.R. § 670.4(b), and as a litigant in each of the criminal appeals before the Appellate Division, it has an obligation to do so. But even if the Nassau County District Attorney knew of the pendency of the appeal, and this Court assumes that it did, the appeal still would have remained unperfected and ignored, because the Nassau County District Attorney's stated policy is not to seek a dismissal when the defendant is incarcerated pending appeal. This policy did not cause the delay, but given Sullivan's conduct, it ensured that the case would remain dormant for over four and one half years. If the District Attorney had moved for a summary dismissal for want of prosecution, the Appellate Division would have, in all probability, discovered the pendency of this suit long before Wheeler filed the instant petition.

C. Did the petitioner assert his right?

Wheeler was persistent in the prosecution of his appeal and the request to have Sullivan assigned to the case can hardly be construed as a waiver of Wheeler's right to due process. Although Wheeler asked specifically that Sullivan be assigned to handle the appeal, there is no evidence that Wheeler knew of Sullivan's negligence before the assignment or that he requested an unskilled practitioner. Sullivan, the former District Attorney of Tompkins County, had handled numerous criminal appeals and was already representing Wheeler in another matter. If anything, it appears that the Nassau County 18–B panel erred by recommending to the Appellate Division that Sullivan be assigned when Sullivan was not associated with the 18–B panel in the Second Department. The testimony of Nat Zablow, the Nassau County 18–B administrator, indicated that applicants must be screened at least twice before they are assigned to the Major Crimes Panel. Attorneys are screened initially to be placed on the 18–B panel and again if they seek to be placed on the Major Crimes Panel. Sullivan was never required to comply with these application procedures and was assigned solely on the basis of a letter he sent to the Clerk of the Appellate Division. In this letter, Sullivan suggests that there would be some economy if he were assigned to handle the Wheeler murder appeal, because of a unity of issues between the murder appeal and an arson appeal. Sullivan made slight reference to his qualifications and offered to supply additional information. He was assigned to represent Wheeler without any further inquiry.

Having secured the assigned counsel of his choice, Wheeler's subsequent conduct can hardly be deemed a waiver. He wrote to Sullivan on at least a dozen occasions and sent a friend to Sullivan's office to speak with the lawyer. After years of unanswered letters and Sullivan's promises that the brief would be ready shortly, Wheeler took the only step that would speed the appeal: he contacted the Appellate Division and sought to have Sullivan replaced. Although it would still be over a year until Wheeler's brief was filed, it appears that Legum's inability to complete the brief within a year after his assignment was not due to Wheeler's failure to press the attorney. Rather, Wheeler queried Legum as doggedly as he had Sullivan. The brief was not filed because Sullivan failed to turn over the transcripts and Legum did not pursue the matter for over a year. Therefore, the Court concludes that Wheeler's conduct did not amount to a waiver of his right to due process.

D. Was there prejudice to petitioner?

In *Barker*, the Supreme Court held that the right to a speedy trial serves three purposes: (i) preventing oppressive pre-trial incarceration; (ii) minimizing anxiety and concern of the accused; and (iii) limiting the possibility that the defense will be impaired. 407 U.S. at 532, 92 S.Ct. at 2193. In a case involving a delay on appeal, these concerns are less likely to prejudice a defendant. *Cousart*, 580 F.Supp. at 69. Accordingly, a pre-trial incarceration is irrele-

vant here because Wheeler has already been convicted. The interest in minimizing a prisoner's anxiety is present here, though not to the extent that it would be relevant in the case of a pre-trial detainee. Wheeler has served only one-fourth of his sentence and, on the basis of his sentence, he can hardly retain an expectation of an early release in the face of a twenty-year term of imprisonment. It should be noted, however, that Wheeler's brother, a co-defendant in the Parcelli murder was sentenced to fifteen years to life but had his conviction vacated on appeal. *People v. Wheeler*, 62 N.Y.2d 867, 478 N.Y.S.2d 254, 466 N.E.2d 254 (1984). He has since been released from jail after pleading guilty to a lesser charge.

The third and most important interest articulated in *Barker* is the impairment of the prisoner's defense. In this case, the interest becomes whether the delay on appeal would impair petitioner's defense on a retrial. *See Cousart*, 580 F.Supp. at 268–69. At this point, it is unknown whether the Appellate Division will order a retrial, but as petitioner has noted, this Court may order a retrial notwithstanding the merits of the state court appeal. *See* 28 U.S.C. § 2243 ("The court shall ... dispose of the matter as law and justice require."); *Carafas v. LaVallee*, 391 U.S. 234, 88 S.Ct. 1556, 20 L.Ed.2d 554 (1968); *Barnes v. Jones*, 665 F.2d 427, 436 (2d Cir.1981). With respect to an impairment of Wheeler's defense on a retrial, it is unclear whether Wheeler would be in a lesser position to defend himself today than he was five years ago. Petitioner has not pointed to any witnesses or evidence that would be unavailable. In addition, all the evidence introduced at Wheeler's 1981 trial has been preserved as part of the record and is available to be used at a retrial. Moreover, petitioner has not shown that he would be prejudiced by the use of trial transcripts as opposed to live witnesses. *See Cousart*, 580 F.Supp. at 269. Indeed, respondent suggests that evidence obtained from petitioner's brother, an accomplice in the murder, may have strengthened the State's case. Nevertheless, if the State is required to retry a defendant, a substantial delay on appeal will prejudice a defendant's Sixth Amendment right to a speedy trial. *Rheuark*, 628 F.2d at 303 n. 8. It can hardly be gainsaid that the passage of five years will make it more difficult for petitioner to refresh the memory of witnesses or locate new exculpatory evidence. On balance the Court finds that the passage of time has, to some extent, impeded Wheeler's ability to present a defense at a retrial and that Wheeler has suffered some prejudice as a consequence of the delay in his appeal.

### E. Federal-State Comity

The final factor to consider is how soon the state appellate court will decide the appeal. *United States ex rel. Smith*, 486 F.2d at 738–39 n. 2; *Parker*, 464 F.2d at 573. Comity assumes that the state court will decide the case with dispatch and that the federal court should not intervene if an act of this Court will not accelerate disposition of the appeal. It is unquestioned that the mere filing of the petition accelerated the resolution of Wheeler's appeal. Shortly after the filing of this petition, the District Attorney obtained an expedited schedule for perfecting the appeal. In May of this year Legum filed a brief on behalf of Wheeler. The Nassau County District Attorneys' Office filed an answering brief on June 3 and the case was argued before Appellate Division on June 10. The Appellate Division has allowed Wheeler to file a *pro se* supplemental brief and the District Attorney was given until August 8 to reply. Because briefs have been submitted, the case has been argued, and the matter will soon be *sub judice*, "[i]t would be inappropriate to foreclose the state appellate courts from deciding the case." *Harris*, 601 F.Supp. at 993.

### IV.

There are perhaps some solutions to the problem of appellate delay. The Court notes that the District Attorney rarely acts to speed an appeal when the defendant is in custody. The Court recommends that a substantial reduction in appellate delay could be achieved if the District Attorney changed its policy and took a more active

role in expediting the disposition of criminal appeals. If each of the ten District Attorneys who appear in the Second Department were required to seek a dismissal of inactive criminal appeals within a year of the filing of the notice of appeal, the disposition of appeals would be expedited and the backlog of cases reduced. If the Nassau County District Attorney had monitored its unperfected appeals, it would have noticed that Legum's 1985 assignment as counsel had classified Wheeler's appeal as a 1985 case. A simple motion to have the case returned to the list of 1981 cases would have prevented at least a year of delay.

The Court perceives a number of advantages to requiring each District Attorney's Office to make a motion to dismiss when an appeal is inactive for a year. First, the responsibility for making the motion is shifted away from the overburdened Appellate Division. Second, the obligation to seek a summary dismissal would be divided equitably among the various prosecutors in proportion to the cases on appeal from each county. Third, the prospect of having to appear before the Court to explain why an appeal is unperfected or why a motion to dismiss was not made would ensure that both prosecutors and defense attorneys litigate the appeals and adhere to schedules. It is this Court's experience that attorneys uphold their obligations if they are aware that they will be held strictly accountable by the Court. The effectiveness of this suggested policy depends, of course, on the ability of the Appellate Division to enforce its policies and act as an effective overseer of its docket. This Court suggests, however, that if the responsibility for initiating summary dismissal motions is placed on the prosecutor, the Appellate Division will be better equipped to keep a watchful and vigilant eye on its calendar and delay could be reduced. It also appears that a larger administrative budget might also alleviate the current backlog.

The evidence in this case also highlights the Appellate Division's difficulties in securing adequate assigned counsel. The need for assigned counsel is met, to some extent, by the Legal Aid Society. Never-theless, Legal Aid is usually disqualified from handling cases with multiple indigent defendants or appeals involving claims of ineffective assistance of counsel by Legal Aid trial lawyers. In such instances, the Appellate Division must look to the list of assigned counsel. Therefore, this Court suggests that another, parallel Legal Aid Society division should be established to handle the appeals of a second co-defendant or the appeal of a defendant alleging ineffective assistance of Legal Aid trial counsel. This second division would be fully insulated from the main organization in order to avoid conflicts of interest, but would employ the same organizational and administrative procedures. The Court notes that such a separate Legal Aid division could reduce the need to look to the 18–B panel for appellate counsel and would create a pool of attorneys to handle criminal appeals.

### VI.

Accordingly, the petition for a writ of habeas corpus is granted. The respondent is directed to retry the petitioner unless the Appellate Division decides his appeal by October 7, 1986. Any adjournments, enlargements, or other delays requested by Wheeler are to be excluded from this period.

SO ORDERED.