## .CHARLESTON.

### STATE v. JOHN GOLDEN.

### Submitted March 7, 1922.    Decided March 14, 1922.

1. CRIMINAL LAW—*Where Prosecutrix Fixes Time of Assault
   and States that She Became Pregnant as a Result Thereof,
   and Had a Miscarriage, Physician's Expert Testimony as
   to Age of Foetus Held Admissible to Show Pregnancy by
   Another than Defendant, as Tending to Show Consent.*

   In a prosecution for rape, where the prosecutrix fixes
   the time and place of the assault and testifies that as a result
   thereof she became pregnant, and had a miscarriage within
   three months from the time of the assault, and that she never
   had other sexual intercourse either before or after the time
   of the assault, testimony of the physician, who attended her
   miscarriage, to the effect that the foetus had been conceived
   "in the neighborhood of 3 to 4 months" prior to its delivery,
   is admissible as tending to show that the prosecutrix had
   become pregnant by some other person, and as tending to
   prove consent, thus sustaining defendant who swears he had
   intercourse with her by her free consent.  (p. 503).

2. SAME—*Where Prosecutrix Testified She Became Pregnant
   as Result of Rape and Had a Miscarriage Within Three
   Months, and Attending Physician Stated Sex of Foetus was
   Easily Ascertained. Other Physicians' Testimony   That
   Such Could Not be Ascertained Unless Four Months Old
   Held Admissible.*

   In such case, where the attending physician swears that
   the sex of the foetus was easily ascertained by casual exam-
   ination, evidence of other physicians is admissible to prove
   that the sex of a foetus cannot be ascertained by such in-
   spection until four months from the date of its conception.
   (p. 503).

3. SAME—*Where Defendant Will Otherwise be Deprived of
   Material Evidence, Affidavit of Absent Witness Should be
   Admitted or Hearing Postponed.*

   Where it is plainly apparent that a misunderstanding has
   innocently arisen between opposing counsel as to the intro-

duction of an affidavit at the trial in lieu of the testimony of a witness who has been summoned but who has left the State on urgent business, and whose evidence is material and vital to the defense in a prosecution for rape, and by reason thereof defendant will be deprived of such evidence, the court should either permit such affidavit to be admitted as evidence, or continue the hearing until the attendance of such witness could be procured.  (p. 505).

4.   SAME—*New Trial Awarded Where Defendant Has Been Deprived of Material Testimony by Surprise.*

Where a defendant in a criminal case, without fault on his part, has been deprived of material and vital evidence in his defense by surprise, thus preventing a fair trial, the verdict should be set aside and a new trial awarded.  (p. 508).

Error to Circuit Court, Mineral County.

John Golden was convicted of rape, and he brings error.

*Reversed and remanded.*

*H. G. Shores, J. Philip Roman* and *F. M. Reynolds,* for plaintiff in error.

*E. T. England,* Attorney General, *R. Dennis Steed,* Assistant Attorney General and *Arthur Arnold,* Prosecuting Attorney, for the State.

LIVELY, JUDGE:

Defendant was convicted of the crime of rape and on the 3rd day of June, 1921, sentenced to confinement in the penitentiary for ten years, and prosecutes this writ of error.

The prosecutrix, Thelma Graham, who had been adopted in the family of Herbert Short and who was known as Thelma Short, was 14 years and 5 months old at the time of the alleged rape. She was fairly well developed physically and weighed 122 pounds. The defendant was 31 years of age, was married, of well developed physique and weighed 175 pounds. These two persons were casually known to each other, possibly having nothing more than a speaking acquaintance. The prosecutrix testified that on the 13th day of December, 1920, about the hour of 8 o'clock P. M., she had been sent on an errand to a down town store and while

performing that. errand she observed defendant, who pre-
ceded her in a small Chevrolet touring car and waited for her
on another street, where he stopped his car and asked her
to come over, that he had something to tell her; that after
some conversation, in which he asked her to. take a drive
with him, she finally consented and got in the front seat
of the car with him and they drove out of town about three
miles to a bridge on the turnpike which spanned a small
stream, where he turned his car and came back in the direc-
ion of Keyser until he reached a lane near the house of a
Mr. Paris, which lane led up near to what was called the red
barn.  He stopped the car about 35 or 40 yards from the
main road, which was at that time frequently traveled,
automobiles. passing in either direction continuously, and
within about 100 yards of the residence of Mr. Paris and
somewhat nearer to the red barn. She testified that after
stopping the car and working a short time with some of
the machinery, he got back in the car and "stood her up" be-
hind the front seat and then climbed over the front seat,
sat her down upon the rear seat of the car, sat down by her
put his arm around her and "loved her a little", kissed her,
and then by force and against her will laid her on the back
seat and had intercourse with her.  She tesified that she
"hollered", was scared, and resisted until her strength gave
out; that in about 10 minutes, he drove away, having placed
her in the front seat with him, and took her back to the
city of Keyser, conversing with her upon general topics while
on the way;. that she alighted from the car near her home
on an unfrequented street, and thence went to her foster
parents' residence.  After then explaining to her foster par-
ents that she had been detained down town on the errand
she had started to run, as an execuse for not returning earlier,
she went into the kitchen, where she obtained a newspaper
and was reading it when her foster mother came in.  She
told her foster mother she was going to bed and her foster
mother said, "yes it is time to go to bed," and then she,
prosecutrix, retired for the night.  The reason she gave why
she did not divulge the alleged crime was because, as she
said, her foster mother had told her if she ever did anything

of that kind she would be sent to some institution or home, presumably some place of correction for such girls. There was nothing unusual about her appearance; her clothing was in no way disarranged or torn, no marks or bruises about her body and nothing unusual in her demeanor, except as stated by Mr. Short, that she appeared stupid and "did not act like herself at all." She said that she was menstruating at the time of the assault and described the clothes she wore, including an absorbent pad. According to her testimony she became with child as a result of the alleged rape, but said nothing about the crime until about the first of March, when her condition impelled inquiry on the part of her foster parents, at which time she told them that a rape had been committed upon her by the defendant, as above set out. She swore that she never had illicit, carnal intercourse with any other person before or after this time. The version of the affair by the defendant is altogether different from that stated by the prosecutrix. He said he was standing in front of Evan's jewelry store on some day during Christmas week in company with Frank Githens and Elmer Wilson, when this girl passed them. A short time thereafter he got in his car and he again saw her on another street and he asked her if she would take a ride with him and she replied that she would like to go but was afraid because her people were watching her, and, after making an appointment to meet him on Orchard Street, he subsequently drove to that street, where he took her in the car and rode with her out to the bridge as testified to by her, and there turned and came back to the intersecting road next to the red barn, where he turned out of the main road up toward the barn, where the car was stopped and after asking her to get over in the rear seat he there sat down by her and "courted her," hugged her, kissed her and asked her if she had ever been out with any other men, and, after some conversation along that line he made a proposition to her to which she consented, and that he had intercourse with her without objection on her part, but with her consent readily given. He testified that while it was dark the car could be readily seen from the main road, which was nearby and frequented at

the time, many automobiles passing along over it, or from the residence of Mr. Paris if anyone had come out, or from the barn which was somewhat near. The minutiae of the sordid affair were detailed by him. He further stated that after getting his car started out of the lane she got in the front seat, where he sat down by her and took her back to a place near her residence, and, at her request, put her off at a street near her home. He is in part corroborated · by Frank Githens, who testified that he was in company with defendant near the jewelry store at the time designated. Thus it will be seen that the act of intercourse actually occurred near the time and place stated by the principal actors. The question then to be determined by the jury was whether the act was committed against the will and without the consent of the prosecutrix. On this question the statements of the two are diametrically opposed. There is nothing to corroborate the prosecutrix in that regard except a statement made by Alma Paris to the effect that sometime before Christmas, the exact date she was unable to state, whether it was the 12th, 13th or 14th, she heard some girl scream in the direction of the lane which was near her house but that she paid no attention to it, stating, "we hear those screams so often we do not think anything of it anymore." There is little probative value in this vague and general statement, both as to the time the screams were heard and their character. However, it was possibly admissible and might be considered by the jury for what it was worth. On the other hand there is some corroboration of the testimony of the defendant in the fact that the girl's clothing was not torn or disarranged; no bruises or marks on her person and nothing in her appearance or demeanor to indicate an unusual occurrence. But it is well established in this jurisdiction that the uncorroborated statements of the prosecutrix in such cases are sufficient to sustain a verdict. Another fact which tends to buttress the defendant's contention that no rape was committed is that prosecutrix made no complaint and said nothing about the occurrence until more than two months afterwards, when it became apparent that she was enceinte and had to give some reason for her condition. But she was

young and inexperienced apparently, and she gave a reason which might have been sufficient to her why she did not tell of the occurrence to her foster mother. As before stated, her reason was that she was affraid of being sent from her then home because her foster mother had told her that if she ever did anything of that kind she would be sent away. Failure to make a prompt complaint on the part of the prosecutrix may be explained, in order to make her evidence admissible, and then the value of the testimony is to be weighed by the jury. 33 Cyc., p. 1469; *People* v. *Gage,* 62 Mich. 271. In *People* v. *Gage,* prosecutrix was a girl of very tender years and for a considerable time after the assault upon her did not divulge it, giving as a reason her fear that her father would whip her. The court said: "Delay in making complaint in case of rape calls for explanation before the court will admit the complaint in evidence. But the fact that the' person injured was a girl of tender years, and appeared to be under a sort of duress, caused by fear of the whipping which the perpetrator of the offense impressed upon her mind would befall her if she told her parents, is a sufficient explanation of the delay to justify the court in admitting her complaint in evidence."

The defense introduced evidence to show that the reputation of the prosecutrix for chastity was bad. It was shown by Viola Fleming that there was a fair in progress near the city of Keyser on the 13th, 14 and 15, of December, 1920, and that she in company with prosecutrix and Mrs. Dorsey's small children attended this fair and while there Vernon Rose was introduced to the prosecutrix by Orlando Whetzell, Rose being introduced under the name of Sisk, who accompanied these two girls on their return to the home of Mrs. Dorsey and from there the prosecutrix and Vernon Rose, alias Sisk, went in the direction of the home of Thelma Short. Viola Fleming is corroborated by Whetzell and Vernon Rose and they all three fix the date as of the 13th day of December, 1920, the time at which the alleged assault by defendant was committed. Rose testified that instead of accompanying the Short girl home he took her to some old abandoned fort on the outskirts of the town and had sexual

intercourse with her on the top steps at a convenient place. All of the statements made by these witnesses are flatly denied by the prosecutrix. The Fleming girl also testified that between the 1st and 10th of that month and year she and Thelma Short were on the streets of Keyser one night when Thelma began flirting with two boys on the street who were in soldier's uniform. These boys, Austin Sayre and Roy Baker, accompanied them a short distance from the town, where they entered through a fence into a field, where there was a straw rick or stack of some kind and Thelma and Baker went behind the stack and remained there for 10 or 15 minutes. For some reason the court refused to permit Viola Fleming to detail a conversation she had with the prosecutrix just before or about the time they entered this field, and exceptions were made to the ruling of the court but the record does not show what the witness would have said. It is apparent that it related to the purpose for which they went to the hay stack, but this is a surmise as the record was not vouched. Neither Sayre nor Baker was introduced as a witness because it was shown that they were in the military service and their whereabouts could not be ascertained. As rebuttal to this statement of Viola Fleming, L. T. Carskadon testified that he was the owner of the field and hay stack and had moved the hay stack some distance away previous to the time of the visit, as stated by the Fleming girl. This was at the close of the trial and the court and prosecuting attorney understood that each side had rested their case and the instructions on behalf of the State were placed in the hands of the court for his consideration. The defense was not ready to submit its instructions then, but stated that they could be prepared and placed in the hands of the court after adjournment. At the session of the court the next morning the defense stated to the court that it had three witnesses then coming to the court house in response to summonses, who would testify positively that Carskadon was mistaken as to the time when the hay stack had been removed by him, and that the hay stack was at the place at the time designated by Viola Fleming; and asked that the evidence be permitted to be introduced. The court refused

to permit this to be done, stating that each side had closed their evidence at the last adjournment of the court the evening of the day before.

Much evidence was produced for the State to the effect that the reputation of the prosecutrix for chastity was good; that she was a member of a church and an attendant at Sunday School.

The evidence of the reputation for chastity of the pros- ecutrix and of the acts of illicit intercourse with other men was for the purpose of showing that it was not likely that she resisted the defendant and that it was not against her will or without her consent; and, conversely, to sustain the evidence of the defendant that she had told him that she "had been out with other boys" and had consented. It is clearly established by our own decisions that such evidence may be introduced and considered for that purpose. *State v. Kittle*, 85 W. Va. 116.

It appears that on the 13th day of March, 1921, just three months after the alleged commission of the assault, the prosecutrix had a miscarriage and Dr. H. F. Coffman was called about two o'clock A. M., to attend her. He made an affidavit to that effect in which he stated that he examined the foetus, which was in a' bucket near her, and that the sex was plainly discernible. Dr. Coffman was summoned as a witness for the defense but for some good reason was compelled to leave the State just before the trial and so stated to the special judge, who had been elected to conduct the trial, and the judge informed him that he should see the attorney for the defense and possibly his absence could be arranged for. This attorney prepared the doctor's affidavit, which contained the material fact above referred to, and presented it to the prosecuting attorney, prior to the trial, and a conflict arose at the trial between the attorney for the defense and the prosecuting attorney as to the agreement to introduce this affidavit as evidence. Defendant's counsel made affidavit that when the case was called for trial he announced that he would be ready if this affidavit was admitted as evidence. This is denied by the State's attorney and the trial judge has no recollection that such a

statement was made. The record is silent upon that part of
the controversy. William MacDonald, a practicing attorney
at the bar, made an affidavit, which is in the record, to the
effect that he heard the prosecuting attorney and the coun-
sel for the defense talking about an affidavit made by Dr.
H. F. Coffman and that his attention was called to the affi-
davit and he read it. He also stated that he asked the pros-
ecuting attorney if the statement of Dr. Coffman would not
be evidence to show that the prosecuting witness was mistaken
as to the time when she had intercourse with Golden and
that the prosecuting attorney agreed that it might be evi-
dence on that point. This affidavit of Dr. Coffman was of-
fered in evidence after the State had closed its evidence in
chief and objection was made by the prosecution to its in-
troduction. After some controversy about its introduction,
one point being urged against it by the assistant proscutor,
that Dr. Coffman, in the affidavit, had not qualified himself
as an expert, the court took the matter under advisement.
Doctors Chas. S. Hoffman, Arnold A. Scherr and M. R. Bell
were in attendance as witnesses for the defense and as they
were anxious to be about their professional duties, the court
then took their evidence in the absence of the jury and pend-
ing his decision upon the admissibility of the affidavit of Dr.
Coffman. These three doctors all stated that they were quali-
fied physicians of long practice and had experience in matters
of child birth and miscarriage. They stated that Doctor
Coffman was an eminent and well qualified physician of long
standing, and an expert in such matters. They stated, with
slight variance, that it would be impossible to ascertain from
a foetus, which had been miscarried and delivered, the sex
of the child until it had been in existence for four months;
and if the sex of this foetus was plainly discernible, as was
stated by Dr. Coffman in his affidavit, then the child would·
have been begotten about four months prior to the date
of this miscarriage. It is apparent that if the affidavit of
Dr. Coffman had gone to the jury, buttressed by the evidence
of these three other eminent physicians, it would have had
a material bearing upon the case, tending strongly to show
that the prosecutrix was mistaken by a month's time as to

the date of the alleged assault; or that she had become with child by some other person prior to the 13th of December, 1920. This evidence would have been admissible for the same purpose as that of carnal communication of prosecutrix with other persons and therefore tend to support the contention of the defense- that the prosecutrix had consented. It can be readily seen that this was vital and important testimony for the defense. When the court again convened and the presiding judge had considered the relevancy of the affidavit of Dr. Coffman, he stated that he was of the opinion on the authority of *Mendum* v. *Commonwealth,* 6 Rand. 704; and *State* v. *MacMaynes,* 61 Ia. 119, that it was competent to show that Dr. Coffman was a physician and the court would so hold, and then counsel stated that they could not reach an agreement in reference to admitting any portion of such statement, and counsel for the defendant then asked the court to admit only the relevant part thereof. The court then investigated the circumstances under which the affidavit was taken and whether the attorneys had agreed upon its introduction. The attorney for the defense was positive that he had exhibited the affidavit to the prosecuting attorney and that he had agreed that it should go to the jury as evidence. The prosecuting attorney stated to the court that he knew nothing of the statement until early in the term and he was asked to sign an agreement to the effect that it could be used in- the trial but he refused to sign an agreement and so informed defendant's counsel, and that he stated to defendant's counsel that he would object to the offer of the statement at the trial. Thereupon the court refused to admit the affidavit of Dr. Coffman or any part of it or any of the evidence of Doctors Hoffman, Scherr, or Bell, taken out· of the hearing of the jury, to which ruling of the court the defendant by counsel objected and excepted. Counsel for the defendant makes affidavit that he then stated he was taken by surprise and asked for a continuance of the case, which was refused. This statement is denied by the trial judge and the prosecuting attorney and the record does not disclose that such motion or statetment was made. It is reasonably clear that counsel for the defense was under the

impression that the affidavit of Dr. Coffman would be admitted as evidence in the trial, or at least the material part thereof, and that he gained such impression or understanding after conference with the prosecuting attorney. The prosecuting attorney admits having the affidavit presented to him for that purpose but denies that he agreed to its introduction. The affidavit of Wm. MacDonald is persuasive that some negotiation or understanding was pending between the attorneys prior to the trial with reference to its introduction as evidence. Defendant's counsel is very positive in his affidavit that there was such an understanding and that he relied upon the same and as a result thereof permitetd his important witness to be absent from the trial. The fact that he did allow this witness to go without the jurisdiction of the court, carrying with him evidence of the most vital and important character to his client, charged with a capital offense, is strongly indicative that he relied upon an assurance that the affidavit would be admitted. Which of the contentions is true we do not know, and it is immaterial. Here was an unfortunate misunderstanding and a matter of serious import to the defendant. The trial court could see that the evidence, if it had been introduced, would be material and vital to his defense. The defendant himself was not to blame. Can we say that blame should be charged to any person? The defendant has been the innocent victim of an unfortunate circumstance. The question that concerns us here is whether the defendant under these circumstances has had a fair trial. Seeing the importance of this pertinent evidence, would it not have been proper for the trial court to delay the trial or discharge the jury and await a time until the defendant could procure his evidence and present a full defense under all these facts and circumstance? The Constitution provides that a person accused of crime "shall be confronted with the witnesses against him, and shall have the assistance of counsel, and a reasonable time to prepare for his, defense; and there shall be awarded to him compulsory process for obtaining witnesses in his favor." The spirit of this provision in our Bill of Rights is summed up in the expression "the defendant shall have a fair trial." We are

not unmindful that the accused .must use diligence and if he does not do so it. is at his peril. But can we say that diligence has not been used here? It is apparent that from the time the indictment was returned defendant had made diligent preparation for his trial. We think under the circumstances that the material part of Dr. Coffman's affidavit, together with the supporting evidence of the other physicians, should have gone to the jury, or that the trial should have been delayed until reasonable effort had been made to procure the attendance of Dr. Coffman. It is apparent that such evidence could have been procured, that it was material to the issue and that it was prejudicial error to the defendant, under all these facts and circumstances, to proceed ·with the trial in its absence. In *Boxley* v. *Commonwealth,* 24 Grat. 649, the prosecutrix made a different statement on the trial from that made by her in the preliminary hearing before Justice of the Peace Melvin, who at the time of the trial was not in attendance upon the court and had not been summoned. His absence and failure of the defense to introduce him as a witness was satisfactorily accounted for, and upon affidavit showing in what particulars she had varied in her two statements and that such variance could be shown by Justice of the Peace Melvin, the verdict was set aside and a new trial awarded on the ground of surprise. Is it not apparent that there was surprise in the case at bar?

Error is assigned because the court refused to permit the defense to cross-examine the prosecutrix about. what became of an absorbent pad which she claimed to have had pinned to her underclothing at the time of the alleged assault, and because of the remarks made by the judge to defendant's counsel in that connection. It was the theory of the defense that the ride in the automobile took place in Christmas week, and at a time when the girl had no menstrual flow, and therefore it became material to inquire specifically as to what disposition was made of this pad on the occasion designated by her. Upon inquiry along this line, the court said, "Mr. Shores, I want you to understand that this girl is only a child and not much latitude will be allowed in your examination of her. You can ask this one question but you cannot go

into this any further." While the court has wide discretion in controlling the manner of examination of young and unsophisticated witnesses, it should not prevent full investigation of facts in their knowledge which may have a material influence in deciding the issues. The court permitted this witness to be led to some extent in her examination, which in tender consideration of her age and inexperience may have been proper, but on the other hand defendant was on trial for his life, and a full cross-examination on the details of the alleged crime should have been permitted. We cannot say that the remarks of the court as shown by the record were prejudicial. It is the result of the ruling, couched in these remarks, which is subject to criticism.

Many exceptions were taken by the defense to refusals to permit answers to be made to questions propounded, but in most instances there is nothing to show what the answers would have been, and hence these assignments of error cannot be sustained.

There are many other assignments of error which, in view of a new trial, it will not be necessary to consider.

The fact that defendant was deprived of the benefit of material evidence by reason of an unfortunate misunderstanding between counsel, clearly shown, coupled with refusal of the trial judge to permit the introduction of witnesses to show that Carskadon was mistaken as to the time when he removed the hay stack, together with lack of corroborating evidence of force used in the commission of the alleged assault, the silence of the prosecutrix until she became pregnant, the verdict of the jury wherein they recommended leniency of the court, and all the other facts, have impelled us to the conclusion that a new trial should be accorded defendant.

The judgment is reversed, the verdict set aside and a new trial awarded.

*Reversed and remanded.*