UNITED STATES of America, Appellee,

v.

William Alton JOHNSON, Appellant.

No. 81–5131.

United States Court of Appeals,
Fourth Circuit.

Argued Jan. 12, 1984.

Decided April 19, 1984.

Benjamin Lipsitz, Baltimore, Md., for appellant.

Barbara S. Sale, Asst. U.S. Atty., Baltimore, Md. (J. Frederick Motz, U.S. Atty., Baltimore, Md., on brief), for appellee.

Before WINTER, Chief Judge, and MURNAGHAN and SPROUSE, Circuit Judges.

HARRISON L. WINTER, Chief Judge:

Defendant was convicted of armed bank robbery and sentenced to a term of twenty years. He appeals contending that his conviction should be set aside, because of the

inordinate delay in the preparation of his trial transcript, and because of errors on the part of the district court (a) in denying his motion to strike the identification testimony of a government witness, (b) in refusing his request for a continuance to determine if he could refute the testimony of a rebuttal witness for the government, and (c) in denying his motions for a judgment of acquittal and for a new trial. We see no merit in defendant's substantive complaints about the manner in which his trial was conducted. We think that he may have been denied due process of law in the unexplained delay in the preparation of the transcript for his appeal, but we conclude that reversal of his conviction is not a proper remedy in this case.

We therefore affirm.

## I.

On February 5, 1981, a branch of the Equitable Trust Company, a federally insured state-chartered bank, was robbed of approximately $38,000 by three masked and gloved black men. The robbers enforced their demand for money with handguns, placed the stolen cash in a brown plastic bag, and fled by automobile. Defendant was charged with the crime and was tried by a jury on his plea of not guilty.

In addition to proving the fact of the robbery, the government adduced evidence to link defendant to the crime. He was identified as one of three black males who engaged in suspicious activity in the vicinity of the bank just minutes before the robbery. He was also identified as one of the three robbers who left the bank and removed their ski masks.

The robbers were traced from the vicinity of the bank to a nearby subdivision where the stolen getaway car was abandoned and the robbers left in two other cars taking with them what appeared to be a brown plastic bag. About an hour later, defendant was seen in an automobile in the area where he lived. Defendant was apprehended after a high-speed chase during which he drove through two roadblocks.

When the car driven by defendant was finally caught, defendant's passenger was found to have over $700 cash on his person, and a pair of gloves and a .45 caliber automatic handgun were found in the interior of the car.

Defendant relied on an alibi defense. He produced several witnesses who had seen him on the morning of the crime but not precisely when the robbery occurred. Another witness claimed to have seen defendant at the time that the robbers were seen immediately prior to the robbery. That witness said that he saw defendant at the latter's home when the witness, who was late for school, went there to retrieve a school book which he had left there the night before. The government proved, however, that this witness was no longer enrolled in school on the day of the robbery. Not only did the government show that the witness had been expelled for narcotics activity, but also that the school he claimed to attend was not in session on that day.

Following the denial of a motion for a new trial and the imposition of sentence, defendant filed a notice of appeal. The notice was filed in early June, 1981, and on June 23, 1981, the district court authorized defendant to proceed *in forma pauperis.* On September 1, 1981, the purchase order for the transcript was placed. The transcript was not produced until August 29, 1983.

We will state other facts in the discussion of the contention to which they relate.

## II.

Defendant's substantive grounds for reversal merit little discussion.

A. The motion to strike identification testimony was made as a result of the following circumstances. The government called as a witness a person who could identify defendant as one of the robbers who removed his ski mask after the robbery, and contemporaneously defendant moved for leave to sit in the spectators' section of the courtroom while that witness

testified. The witnesses had been sequestered, but that witness, apparently inadvertently, began to enter the courtroom before defendant sat in the spectators' section as the district court had permitted him to do. It is defendant's theory that the witness saw him under circumstances that made it known to the witness who was the defendant, and that therefore the in-court identification of defendant by the witness was impermissibly tainted.

■ We see no merit in the contention because defendant's counsel was given ample opportunity to interrogate the witness as to factors affecting the positive identification that he made, and trial counsel refrained from any such interrogation. Specifically, counsel could have inquired if the witness had noticed defendant before defendant sat in the spectators' section and if such a viewing affected the witness's in-court identification. This counsel failed to do. As a result, the record does not even establish that the witness saw defendant under circumstances indicating that he was the defendant.

Moreover, our analysis of the testimony of the witness persuades us that he testified from recollection and not from any recent viewing. Indeed, he had made a positive identification of defendant from a photo spread even before there was an opportunity to view defendant in the courtroom.

B. When the government produced evidence to rebut defendant's only really positive alibi witness, defendant moved for a continuance "to determine if he could refute the testimony." Defendant made no proffer of any evidence to refute, neither did he make any representation as to the likelihood that such evidence could be found.

■ Whether to grant a continuance is a matter committed to the sound discretion of the district court. *United States v. Hutchison,* 352 F.2d 404, 405 (4 Cir.1965). We see no abuse of discretion in the district court's denial of a continuance in this case.

■ C. The claim of reversible error in denial of a motion to acquit and a motion for a new trial both raise an issue as to the legal sufficiency of the evidence to convict. From our examination of the record, we have no doubt that the evidence was legally sufficient to convict.

### III.

Defendant's contention that the two-year delay in the preparation of his trial transcript entitles him to release from custody includes two elements: (1) that the two-year delay constituted a due process violation, and (2) that the proper remedy for such a violation is to dismiss the charges and release defendant from custody. We will discuss these seriatim.

■ A. There is authority, to which we subscribe, that undue delay in processing an appeal *may* rise to the level of a due process violation. *See Rheuark v. Shaw,* 628 F.2d 297, 302–3 (5 Cir.1980), *cert. denied,* 450 U.S. 931, 101 S.Ct. 1392, 67 L.Ed.2d 365 (1981) (action under 42 U.S.C. § 1983 by criminal defendants against state judge, court reporter, and other officials based on undue delay in preparing transcript for purposes of appeal of criminal defendants' trial); *Layne v. Gunter,* 559 F.2d 850, 851 (1 Cir.1977), *cert. denied,* 434 U.S. 1038, 98 S.Ct. 776, 54 L.Ed.2d 787 (1978) (inordinate delay in the adjudication of a post-conviction remedy may work a denial of due process cognizable in federal habeas corpus); *Smith v. Kansas,* 356 F.2d 654, 656 (10 Cir.1966), *cert. denied,* 389 U.S. 871, 88 S.Ct. 154, 19 L.Ed.2d 151 (1967).

■ In determining whether a given delay amounted to a due process violation, the Fifth Circuit in *Rheuark, supra,* 628 F.2d at 303, employed the factors set forth by the Supreme Court in *Barker v. Wingo,* 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), as appropriate to determining whether a violation of the sixth amendment right to a speedy trial had occurred. The four factors are the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the de-

fendant." *Id.,* 407 U.S. at 530, 92 S.Ct. at 2191. We agree that these factors are the appropriate criteria for determining if there was a due process violation.

With regard to the first of these factors, the two-year delay in this case is in the range of magnitude of delay as a result of which courts have indicated that due process may have been denied. *See, e.g., Smith, supra,* 356 F.2d at 657 (one-year delay in hearing post-conviction petition); *Layne, supra,* 559 F.2d at 851 (three-year delay in allowing motion for preparation of transcript); *Rheuark, supra,* 628 F.2d at 302–3 (assumes without deciding that two-year delay in preparing transcript for appeal violates due process).

With regard to the second factor—the reason for the delay—the record is silent. Defendant's counsel, in oral argument, told us that in another case in which he had been appointed to represent an indigent defendant, preparation of the transcript by the same reporter is overdue by more than two years. We are aware also of statistics maintained and supplied by our Clerk with regard to late delivery of transcripts as well as his efforts to cure delinquencies. It suffices to say that in the District of Maryland overall, and with this reporter in particular, there are substantial and numerous delinquencies. Of course, the reporter is not a party to these proceedings, and the reporter has not been heard in explanation. Nevertheless, it is fair to say that this case is only part of a significant problem for which no good explanation has yet been advanced. We do not suggest that court reporters in the District of Maryland are willfully delinquent in the performance of their duties, but we have no doubt that there is a serious problem warranting correction by the district court and by us.

With respect to the third factor, the government contends that defendant was not adequately persistent in obtaining speedy preparation of the transcript. The record simply does not support the government's assertion. Defendant filed all forms necessary to obtain the transcript in a timely fashion. Defendant did press his court-appointed attorney to obtain the transcript, and his counsel in fact did communicate with the court reporter, all to no avail. Finally, defendant sought recourse to us in the form of a *pro se* petition for a writ of mandamus to obtain preparation of the transcript. Manifestly, defendant did as much as it is wise to require an accused to do to obtain the transcript.

The fourth factor, prejudice to the defendant, concerns three interests of the defendant which the right to a speedy trial was designed to protect: (1) prevention of oppressive pretrial incarceration; (2) minimization of anxiety and concern of the accused; and (3) limitation of the possibility that the accused's defense might be impaired. *Barker v. Wingo, supra,* 407 U.S. at 530, 92 S.Ct. at 2191. The government suggests that Johnson's incarceration for two years while awaiting preparation of the trial transcript was not oppressive because Johnson also had to serve a consecutive Maryland sentence and thus would have remained in prison whether his federal appeal was successful or not. The government, however, gives no indication as to whether defendant might have been pursuing appeals of the Maryland conviction or other post-conviction remedies that might have resulted in vacation or reduction of the Maryland sentence. But even if defendant would not be free if this appeal were successful, the other interests identified by the Supreme Court to be considered in determining whether prejudice to the accused has accrued weigh in Johnson's favor. His anxiety over the outcome of his appeal was obvious, and the appeal possibly was determinative of how long he would have to spend in prison. The passage of almost three years between his original conviction and resolution of his appeal also undermines the likelihood of a reliable development of the facts at a new trial, if that should be necessary.

■ In summary, we conclude that the delay in preparing defendant's transcript may well have violated due process.

B. We conclude, however, that where, as here, the appeal has been heard and

found lacking in merit there is not any sound reason to order defendant's release. *Cf. Layne, supra* (where undue delay in state appeals process had resulted in possible denial of due process to petitioner, nonetheless affirmative relief was inappropriate where state courts were now moving forward with petitioner's appeal); *Morales Roque v. Puerto Rico*, 558 F.2d 606, 607 (1 Cir.1976) (release of prisoner when appeal is delayed is only a last resort; order directing expeditious preparation of transcripts is likely to be more appropriate). *Cf. Rheuark, supra* (§ 1983 action by appellant against state court judge, court reporter and county commissioners alleging undue delay in preparing transcript for appeal).

This is not to say that a possible or actual due process violation must go unremedied. Both we and the district court have supervisory powers over court reporters including the power to punish for civil contempt in appropriate cases. In addition, we have authority under the All Writs Act, 28 U.S.C. § 1651, to grant mandamus and other extraordinary relief. More importantly, it is incumbent on us and the district court to monitor the production of transcripts so that an unjustified delay of the magnitude of that in this case does not recur. As was said so graphically in *Rheuark, supra*, 628 F.2d at 304, "[t]he cancerous malady of delay, which haunts our judicial system by postponing the rectification of wrong and the vindication of those unjustly convicted, must be excised from the judicial process at every stage."

AFFIRMED.