396 S.E.2d 871

**STATE of West Virginia**

v.

**Charles Ray MERRITT.**

**Charles Ray MERRITT**

v.

**Carl LEGURSKY, Warden, West Virginia Penitentiary.**

Nos. 19489, 19488.

Supreme Court of Appeals of West Virginia.

July 26, 1990.

Michael J. Farrell, Jenkins Fenstermaker, Krieger, Kayes & Ferrell, Huntington, for Charles Ray Merritt.

Roger W. Tompkins, Atty. Gen., Richard M. Riffe, Sr. Atty. Gen., Charleston, John L. Cummings, Pros. Atty., Huntington, for State of W.Va.

Roger W. Tompkins, Atty. Gen., Richard M. Riffe, Sr. Asst. Atty. Gen., Charleston, for Carl Legursky.

WORKMAN, Justice:

Charles Ray Merritt (hereinafter the defendant) was convicted of first degree murder and sentenced by the Circuit Court of Cabell County to life without mercy. The defendant now appeals his conviction on the basis of numerous assignments of error, but contends that the primary assignment is insufficient evidence. In addition to the appeal of his criminal conviction, the defendant has filed a writ of habeas corpus ad subjiciendum seeking an unconditional discharge coupled with an injunction against further prosecution of the underlying criminal action based on the seven and one-half year delay prior to the perfection of his appeal. Because this Court finds no merit in the assignments of error raised by the defendant, we affirm the conviction. Notwithstanding any due process violation which may have occurred due to the delay in perfecting the defendant's appeal, because the appeal has now been heard and found to be without merit, we deny the writ of habeas corpus.

Three individuals were co-indicted with the defendant for the victim's murder. These individuals were Acie Merritt (Acie), the defendant's brother, Monica Wolowinski (Monica), the victim's wife, and Alfreda Adkins, the defendant's girlfriend. At the time of the defendant's trial, Acie had not yet been tried. After the defendant was convicted, Acie entered a plea of guilty to voluntary manslaughter on March 23, 1982. Monica was indicted a second time for complicity in connection with her husband's murder, but she was never tried on the charges set forth in either of the indictments. She was granted complete immunity from prosecution in connection with the murder on December 4, 1981, in exchange for her testimony in the trials against the defendant and Acie Merritt. The state agreed to *nolle prosequi* its indictment against Alfreda Adkins. The defendant was convicted on February 8, 1982, for the first degree murder of John Wolowinski.

The murder conviction was obtained against the defendant primarily on the basis of circumstantial evidence. Acie Merritt had been residing at the Wolowinski residence, from which John Wolowinski was frequently absent, sometimes being out-of-town up to five days a week due to his work. Monica testified that she had had a sexual relationship with Acie, that John had come home early and found them in bed, and that Acie had been ordered out of the Wolowinski residence by John Wolowinski two days prior to his death. Monica testified that her husband told Acie "we was going to get it. We could do better without him." Monica stated that Acie left with no argument and took some of his clothes with him.

Monica Wolowinski testified that on the evening of her husband's murder, she left him at home late in the evening, but before dark, and went to a laundromat with Alfreda Adkins, as well as Monica and John's two children. While they were at the laundromat, the defendant, Acie, and Junior Webb arrived in the defendant's red Ford pickup truck. Monica testified that Acie stated at the laundromat that he was going to the Wolowinski residence for the purpose of collecting certain items of his clothing which remained there. Before leaving the laundromat, Acie, along with the defendant and Junior Webb, borrowed Alfreda Adkins' automobile. The three men then drove away in Alfreda Adkins' green Chevrolet, leaving the defendant's truck parked outside the laundromat. After the women had finished their laundry and after what Monica said "felt like quite awhile," the defendant, Acie, and Junior Webb returned the green Chevrolet to the laundromat parking lot. Monica's only testimony regarding when the three men returned was that "[i]t was just after dark." At this point, according to Monica, in response to

her using foul language with the defendant for making her wait for him to return with Alfreda's vehicle, the defendant, while laughing, allegedly stated "your troubles are over." Alfreda drove Monica home, where they discovered the dead body of John Wolowinski. The cause of Wolowinski's death was determined to be a shotgun wound to his left chest wall and a gunshot wound to his back. After Monica finished talking with the police following her discovery of her husband's body on the night of the murder, she went with Alfreda to the defendant's trailer. While she was there, she testified that the defendant told her that Wolowinski did not suffer in response to her imploration, "Somebody has got to tell me he didn't suffer."

Earlier on the day of the murder (between 5:30 p.m. and 6:30 p.m.), the defendant had shown a sawed-off shotgun to a friend of his, Larry Chapman, and said "I'm going to use this." A neighbor of the Wolowinskis heard sounds which she likened to gunshots between 10:00 and 10:30 p.m. on the evening of September 3, 1981. The neighbor recalled hearing two separate gunshots at approximately 10:20 p.m. Between midnight and 1:00 a.m. on September 4, 1989, the defendant and Acie were driving in the defendant's red Ford pickup truck on their way back to the defendant's trailer. They encountered a group of acquaintances walking down the road, picked them up in the truck, and invited them to smoke marijuana at the defendant's trailer. Daniel Kitchen and Jerry Carter were among this group of individuals.

Jerry Carter testified that the defendant asked him sometime during their partying that morning to hide some guns for him. The defendant also asked Carter to wrap the guns in a tarp which was covering a motor in the back of the truck. Daniel Kitchen testified that the defendant asked him during this same party session whether he wanted to buy some guns at an unspecified price, but indicated that it was understood it would be a "cheap price." The defendant did not show the guns to Kitchen, but the guns which Kitchen agreed to buy were removed from the defendant's truck wrapped in a yellow tarp. Later that same day when the state police questioned Daniel Kitchen, he produced four guns: a sawed off shotgun, a .12 gauge shotgun, a .22 calibre pistol, and a .32 calibre pistol. The victim's .22 calibre pistol was later discovered to be one of the guns which Kitchen turned over to the police.[1] Two .32 calibre bullets were removed during Wolowinski's autopsy—one from his right back and one from his right thumb.[2] When questioned at trial, both Carter and Kitchen readily identified the four weapons as those which they removed from the defendant's truck on September 4, 1981.

The forensic and ballistic analysis of the bullets retrieved from Wolowinski's body proved inconclusive. The state's firearm expert, Sergeant Lane, testified that he could not determine for certain whether the two bullets removed from the victim's body had originated from the .32 calibre pistol turned over to the state police by Kitchen because the bullets were "damaged to the extent there [were] ... not sufficient characteristics still remaining on them to identify with the firearm." In addition, a blood stain analysis of the defendant's clothing [3] did not reveal any blood stains whatsoever. No witnesses were able to testify that they

---

1. At trial, the victim's wife produced the receipt for the .22 calibre pistol which was included in the guns that Kitchen gave to the state police. The record suggests that the serial number stated on the sales receipt corresponded to that on the pistol in the state's possession.

2. The state's medical examiner made no determination as to the caliber of the removed slugs. He turned the slugs over to the state police who in turn presented them to a firearms expert for identification and analysis.

3. Although certain articles of the defendant's clothing—two T-shirts, a pair of blue jeans, a flannel shirt, and a pair of cowboy-type boots—were analyzed, the state admitted that it had no idea what the defendant was wearing on the night of the murder. The clothing which was tested was obtained from defendant's residence through a search warrant obtained several days after the shooting, and the record is silent as to why these particular articles of clothing were seized.

saw the defendant at the scene of the murder on the night in question.

The jury did, however, hear testimony of two witnesses, Monica Wolowinski and Jerry Carter, that provided them with a basis for connecting the defendant to the murder. Jerry Carter testified that in the early morning hours of September 4, 1981, while he was partying at the defendant's trailer, he heard the defendant say something about killing "some dude" and also that the defendant described the murder by saying that he knocked on the door and when he opened it he shot him and also that he shot him again after the "dude" cut through a room. This testimony was consistent with the blood stains discovered in the Wolowinski residence and the crime sketch prepared by the investigating officer.

Monica's testimony regarding Acie's stated intention to return to the Wolowinski residence certainly suggested that the defendant had both the opportunity to be at the Wolowinski residence during the time when the victim was murdered and a motive for committing the crime. Although the defendant had no known prior connection to the victim, the fact that his brother Acie had been having an affair with the victim's wife and that Acie had just been kicked out of the victim's home two days prior to the murder certainly suggests a possible motive. Perhaps one of the most damaging pieces of evidence was Monica's testimony that she recalled seeing her husband's .22 calibre pistol in the box in the hall closet just before she went to the laundromat, and that she may have seen the same gun box in the defendant's truck on the evening of the murder.

Additional evidence which was introduced against the defendant included the fact that he had a cut on the web of his hand between his thumb and his forefinger when he was arrested the day after the murder. The state's firearms expert testified that the firing of a sawed-off shotgun could cause such a cut to the web of the hand.

Certain individuals whose testimony may have been relevant were either not called to testify or were unavailable. Acie was not called to testify as he remained under murder charges at that time and his case, which had been severed from defendant's, had not gone to trial. Although the state had several subpoenas prepared for Alfreda Adkins, she was never served with one. Apparently the state never checked to see if she was served, believing she would appear and testify voluntarily. When she did not appear on the day of trial, the state moved for a continuance on the basis of her absence. During a hearing on that motion, a state trooper testified that he had information that Alfreda had moved out of her residence late the evening before trial and had apparently gone to California with another Merritt brother, nicknamed "Peanut". Daniel "Junior" Webb was murdered shortly after the arrest of Acie and the defendant. The record discloses that still another of the defendant's brothers, Delbert Merritt, and a half-brother were charged with first degree murder in connection with "Junior's" murder and that "Junior's" body was reportedly discovered on property belonging to a relative of the defendant. The jury heard no evidence relating to these matters.

In his petition for a writ of habeas corpus ad subjiciendum, the defendant contends that the state has been extraordinarily derelict in its duty to provide him with a timely appeal.[4] The delays experienced by

---

4. The following chart sets forth the history of the delays which occurred in connection with the defendant's attempts to perfect an appeal of his murder conviction:

| DATE | | | REASON | DURATION OF DELAY |
|---|---|---|---|---|
| 7–8–82 | to | 8–24–83 | preparation of transcript* | 1½ years |
| 8–83 | to | 1–86 | trial counsel's failure to prepare appeal papers | 2½ years |
| 1–22–86 | to | 7–15–86 | *pro se* representation | ½ year |
| 7–15–86 | to | 6–30–89 | newly-appointed counsel's failure to prepare appeal papers* * | 3 years |
| 6–30–89 | to | present | current appointed counsel's preparation of petition for appeal | ½ year |

the defendant in connection with his appeal are primarily attributable to his difficulty in obtaining a complete copy of the trial transcript combined with appointed counsels' dilatory actions in perfecting and presenting his appeal. The defendant was re-sentenced on three separate occasions for purposes of extending the appeal period, and four appeal periods expired without the perfection of an appeal. He maintains that the only remedy for this constitutional violation is an unconditional release from imprisonment combined with enjoinment from further prosecution.

## I.

The defendant's primary basis for appeal is the allegation of insufficient evidence. As this Court recognized in *State v. Starkey*, 161 W.Va. 517, 244 S.E.2d 219 (1978),

> In a criminal case, a verdict of guilt will not be set aside on the ground that it is contrary to the evidence, where the state's evidence is sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt. The evidence is to be viewed in the light most favorable to the prosecution. To warrant interference with a verdict of guilt on the ground of insufficiency of evidence, the court must be convinced that the evidence was manifestly inadequate and that consequent injustice has been done.

*Id.* 161 W.Va. at 517, 244 S.E.2d at 220, Syl. Pt. 1. To determine whether there is any merit to the allegation of insufficient evidence, we must analyze the evidence introduced at trial in view of the "manifestly inadequate" standard established by *Starkey. Id.*

Before we reach the "manifestly inadequate" examination, however, we must first determine whether the circumstantial evidence was sufficient to convict the defendant under this Court's ruling in *State v. Phillips*, 176 W.Va. 244, 342 S.E.2d 210 (1986). In *Phillips*, we stated that "[i]f, on a trial for murder, the evidence is wholly circumstantial, but as to time, place, motive, means, and conduct it concurs in pointing to the accused as the perpetrator of the crime, he may properly be convicted." *Id.* at Syl. Pt. 4 (quoting *State v. Beale*, 104 W.Va. 617, 632–33, 141 S.E. 7, 13 (1927)); *accord* Syl. Pt. 2, *State v. Smith*, 181 W.Va. 700, 384 S.E.2d 145 (1989).

■ Applying *Phillips*, we find that the evidence as to time, place, motive, means, and conduct overwhelmingly points to the defendant as a perpetrator of the crime. Although the exact time of the murder was not pinned down, it had to occur while Monica Wolowinski was at the laundromat in the late evening hours of September 3, 1981. According to Monica Wolowinski's own testimony, the defendant left the laundromat in the company of her lover, Acie, who had just stated an intention to go to the Wolowinski residence to pick up the remainder of his belongings which he had not taken when the deceased had kicked him out of the Wolowinski home just two days earlier. This testimony was critical for the prosecution because it provided the defendant with the opportunity to be at the place of the murder—the victim's house—during the only time when the murder could have occurred. Contrary to the defendant's contention, we do not view this case as one without a possible motive. The jury could have reasonably surmised that the defendant's motive was a brother wanting to assist another brother in either taking revenge against Wolowinski for kicking

---

\* The defendant claims that the transcript prepared by August 24, 1983 was "incomplete" because it did not contain the first portion of the prosecutor's closing. The state argues that no objections were made and no errors occurred during the initially omitted portion of the transcript.

\*\* Although a second attorney was initially appointed to replace the defendant's counsel on 7–15–86, that attorney claimed he was never advised of the appointment. When the defendant advised the court on February 6, 1987, of the failure of his newly-appointed counsel to perfect his appeal, new appellate counsel was appointed on May 7, 1987.

him out of the house or eliminating him so that Acie could be free to continue his relationship with Monica.[5] Perhaps one of the most persuasive pieces of evidence, in the jury's collective eyes, was the presence of the victim's pistol among the four guns that the defendant disposed of in the early morning hours following Wolowinski's murder, coupled with the fact that the victim's wife had not only seen the gun in her home prior to the murder, but also thought that she may have seen the box in which it was kept in the defendant's truck on the night of the murder. In addition, the .32 calibration of the bullets retrieved from the victim's body together with the possession by the defendant of a .32 calibre pistol immediately after the murder occurred proved that the defendant had the means to commit the murder. The defendant's conduct, specifically his statements to Chapman, Carter, Kitchen, and the victim's wife, both before and after the murder, was consistent with the evidence which pointed the finger at him as a perpetrator of the murder. Accordingly, we will not disturb the jury's determination regarding the combined weight of this circumstantial evidence. *See State v. Bailey*, 151 W.Va. 796, 806, 155 S.E.2d 850, 856 (1967); *accord Smith*, 384 S.E.2d at 148.

 Having survived the initial test of conviction through circumstantial evidence, we can now proceed to determine whether the evidence presented was "manifestly inadequate" under *Starkey*. *See* 161 W.Va. at 517, 244 S.E.2d at 220, Syl. Pt. 1. While we recognize that a finding of sufficient circumstantial evidence to convict will generally result in the related conclusion that the evidence was not manifestly inadequate, the standards of review are different, and must be applied separately.[6] Whereas, a circumstantial case must survive the challenge of whether the evidence points to the accused with respect to time,

place, motive, means, and conduct, the *Starkey* standard requires that the evidence, as a whole, must be "sufficient to convince impartial minds of the guilt of the defendant beyond a reasonable doubt." *See id.* In viewing the evidence in the light most favorable to the prosecution, as we are required, we must conclude that the record discloses that there was sufficient evidence to convince impartial minds of the defendant's guilt beyond a reasonable doubt.

## II.

Several assignments of error arise from the testimony of Jerry Carter. These assignments concern the competency of Carter to testify, improper use of impeachment, and ineffectiveness of counsel. The issue of Carter's competency to testify stems from the following comments about Carter made by counsel and the court in connection with the use of a previously-taped statement to refresh Carter's recollection.

Mr. Cummings [the prosecuting attorney]: On the tape—also as a very uneducated, probably mentally incompetent person, I think I have shown that.

The Court: If he is mentally incompetent, he should not be testifying.

Mr. Beter [defense counsel]: And because of his low mentality, he is susceptible to leading and intimidation and everything else.

. . . .

The Court: The Court will permit you to lead him [Carter] somewhat because of the mentality. It is obvious to the Court he has limited education and mentality.

The competency of a witness to testify is controlled by Rule 601 of the West Virginia Rules of Evidence which provides: "Every person is competent to be a witness except as otherwise provided for by statute or

---

**5.** The jury could also have found the defendant guilty under the theory of aiding and abetting if they did not believe that he was the one who pulled the trigger. The state offered and the court approved two instructions, Nos. 4 and 5, which informed the jury that they could find the defendant guilty as charged in the indictment if they believed that he aided and abetted another

individual in connection with the victim's murder.

**6.** *See Phillips*, 176 W.Va. at 245, 342 S.E.2d at 211, Syl. Pt. 4, for the standard of review applicable to an appeal of a circumstantial conviction.

these rules." Since the West Virginia Legislature has not enacted any legislation which would further limit or clarify the competency of low I.Q. witnesses to testify,[7] issues of competency must be resolved through the limited guidance of Rule 601. The Fourth Circuit Court of Appeals, however,

> has consistently suggested that every witness is presumed to be competent, and neither feeblemindedness nor insanity renders a witness incompetent or disqualified. The only grounds for disqualifying a party as a witness are that the witness does not have knowledge of the matters about which he is to testify, that he does not have the capacity to recall, or that he does not understand the duty to testify truthfully.

F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* § 2.2(B) (2d ed. 1986) (citing *United States v. Odom,* 736 F.2d 104 (4th Cir.1984)).

▮ As the Fourth Circuit has clearly recognized, an individual who has a low I.Q. is not presumed to be incompetent to testify. The trial judge must assess the witness to determine competency in view of his knowledge regarding the subject matter, capacity for recall, and ability to understand his duty to testify truthfully. Once that determination has been made, because " 'the question of the competency of a witness to testify is left largely to the discretion of the trial court, ... its judgment will not be disturbed unless shown to have been plainly abused resulting in manifest error.' Point 8, Syllabus, *State v. Wilson,* 157 W.Va. 1036, 207 S.E.2d 174 (1974)." Syl. Pt. 3, in part, *State v. Butcher,* 165 W.Va. 522, 270 S.E.2d 156 (1980).

▮ Having reviewed Carter's testimony in its entirety, we find that the trial judge did not abuse his discretion in permitting Carter to testify initially or in permitting him to continue testifying following the above-quoted discourse concerning Carter's intelligence. Carter's ability to think for himself and to testify truthfully despite the prosecutor's efforts to lead his testimony is apparent from the following testimony elicited during direct examination. (By the prosecuting attorney):

Q: Jerry, do you remember Charlie Merritt describing how the person who was shot was killed or how the act was done?

A: He *might have said* that something like he knocked on the door and when he opened it he shot him or something like that. (emphasis supplied)

Q: Did he state anything else in regard to how he was shot?

A: He *might have said* he shot him when he opened the door and then he shot him again or something like that. (emphasis supplied)

Carter obviously did a rather skillful job of hedging when questioned regarding his pre-trial statement, and yet did not testify inconsistently. His manner of responding was so effective that it prevented impeachment.

Although Carter's intelligence may have been noticeably limited, his intelligence was not so deficient in the eyes of the trial court that he was incompetent to testify. Rather than prevent an individual with limited intelligence from testifying altogether, the court is permitted, in its discretion, to lead such a witness. *See Cleckley, supra,* at § 3.5(B)(e)(4) (citing *State v. Golden,* 90 W.Va. 496, 111 S.E. 320 (1922)). The court properly permitted the prosecutor to lead Carter in his testimony upon its realization that Carter's I.Q. hampered his ability to concentrate on the subject matter of the inquiries. *See id.* The state attempted to have him declared a hostile witness, but the court denied that motion, explaining at several junctures that Carter had not been declared a hostile witness and that permission to question Carter in a leading manner was limited to the format of the questions and was granted solely because of Carter's limited intellect.

When Carter took the stand, the court "had the benefit of observing the demeanor of the witness as he testified," and we are

---

7. West Virginia Code § 57–3–1 (1966), does address, however, the competency of witnesses to testify in connection with communications and transactions involving insane or lunatic persons.

without such benefit. Accordingly, "we will defer to the trial court's findings that the witness was competent to testify...." *Butcher*, 165 W.Va. at 527, 270 S.E.2d at 159.

 The defendant also argues that the prosecutor was improperly permitted to impeach the testimony of Carter through use of a previously-taped statement. Our review of the record on this issue demonstrates that the taped statement was only used to refresh Carter's recollection and not to impeach his testimony. (By the prosecuting attorney):

Q: Jerry, do you remember talking to Trooper Berlin and Trooper Isgate on September 4th, the next day?

A: Yeah.

Q: And did you give them a statement?

A: Yeah.

. . . .

Q: Do you remember a week ago Tuesday talking to me?

A: Yeah.

. . . .

Q: Do you remember whether or not there was a tape recorder on?

A: There might have been.

The Court: Let me see you at the bench, please.

. . . .

[Prosecutor]: Your Honor, I am attempting at this point to lay a foundation not to impeach him [Carter] but to offer to refresh his memory from the statements we have and the tape recording....

. . . .

The Court: Mr. Carter, apparently you have given a statement to the police. When was the last time that that statement was read back to you?

A: I believe it was day before yesterday.

. . . .

The Court: Mr. Carter, do you want somebody to read the statement back to you again? Would it help you in your testimony?

A: Yes.

At this point, the defendant's trial counsel objected to permitting Carter to review the prior statement.

Mr. Beter: He has indicated he didn't remember what he said.

The Court: That is why I will let him refresh his memory and he told me he would like to have it refreshed.

After the court took a short recess to permit Carter to listen to the taped statement,[8] the prosecutor resumed questioning Carter about what the defendant had stated regarding the murder. When the prosecutor asked the court to declare Carter an adverse witness and to permit him to impeach Carter's testimony through use of the prior statements, the court sustained defendant's objection and further stated that [Carter] "has testified enough on this particular point."

The record convinces us that the state was never permitted to impeach Carter with the prior statements. The statements were used for a limited purpose—to refresh Carter's recollection. This is a classic case of recollection being refreshed consistent with the West Virginia Rules of Evidence. *See* W.Va.R.Evid. 612; *see also Cleckley, supra*, at § 3.8. Accordingly, we find no merit in the assignments of error arising from the use of Carter's prior statements.

 Defendant argues that he was denied effective assistance of counsel with regard to his trial counsel's failure to object to Carter's competency to testify in view of the prosecutor's remarks concerning Carter's intellect. He also assigns as error his counsel's failure to seek an *in camera* hearing to determine Carter's competency. Although the record suggests that Carter had a limited intellect, he obviously had knowledge and recall of the matters to which he testified and there was no indication whatsoever that he did not understand the duty to testify truthfully. As to an *in camera* hearing, this Court has never ruled that an *in camera* hearing is

---

**8.** The defendant and his counsel were present at the playing of the tape-recorded statement, so there was clearly no opportunity for any type of coercion or coaching by the state during the refreshing process.

required to assess the issue of competency. In an appropriate case, such a hearing may, however, prove beneficial when the court sees a need to make further inquiry regarding an individual's competency to testify and prefers, for obvious reasons, to do so out of the jury's presence. But the failure of defendant's trial counsel to request an *in camera* hearing under the facts of this case, which demonstrate that Carter's low I.Q. was both called to the court's attention and appropriately compensated for (use of prior statement(s) to refresh recollection and use of leading question format), was clearly not error.

The remaining assignments of error arising from alleged ineffective assistance of counsel must be judged in view of this Court's holding in *State v. Cecil,* 173 W. Va. 27, 311 S.E.2d 144 (1983):

> In the determination of a claim that an accused was prejudiced by ineffective assistance of counsel violative of Article III, Section 14 of the West Virginia Constitution and the Sixth Amendment to the United States Constitution, courts should measure and compare the questioned counsel's performance by whether he exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law, except that proved counsel error which does not affect the outcome of the case, will be regarded as harmless error.

*Id.* at Syl. Pt. 1 (quoting Syl. Pt. 19, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974)). We have also recognized that

> [w]here a counsel's performance, attacked as ineffective, arises from occurrences involving strategy, tactics and arguable courses of action, his conduct will be deemed effectively assistive of his client's interests, unless no reasonably qualified defense attorney would have so acted in the defense of an accused.

Syl. Pt. 21, *State v. Thomas,* 157 W.Va. 640, 203 S.E.2d 445 (1974).

Having examined the allegations of ineffective assistance of counsel, we conclude that trial counsel "exhibited the normal and customary degree of skill possessed by attorneys who are reasonably knowledgeable of criminal law," and that the allegations, as a whole, present themselves as strategy decisions upon which reasonably qualified trial counsel may differ. It is this Court's collective opinion that while the claim of ineffective assistance of counsel at trial has no merit, the claim as it relates to the appeal process does. For an appeal of a criminal conviction to take seven and one-half years to reach this Court is both unfathomable and undeniably an extreme dereliction of appointed counsels' duties. However, in view of our holding set forth in Section III of this opinion, the ineffective assistance of counsel provided to defendant during the appeal process did not ultimately prejudice him.

Based on our determination that there is no merit to any of the assignments of error discussed above and those additional allegations of error which we do not address, we hereby affirm the defendant's conviction for the murder of John Wolowinski.

### III.

Having dispensed with the appeal by affirming the conviction, we now proceed to determine whether the defendant is entitled to an unconditional discharge given the delays he has experienced both in obtaining a transcript of the trial and in perfecting the appeal of his February 1982 conviction. The defendant relies on this Court's decision in *Rhodes v. Leverette,* 160 W.Va. 781, 239 S.E.2d 136 (1977), to argue that the state's extraordinary dereliction with regard to assisting him in the appeal process entitles him to an unconditional discharge coupled with enjoinment of further prosecution.

In *Carter v. Bordenkircher,* 159 W.Va. 717, 226 S.E.2d 711 (1976) this Court stated:

> In determining appropriate relief in habeas corpus for ineffective assistance of counsel in not prosecuting a timely appeal, the court should consider whether there is a probability of actual injury as a result of such denial, or alternatively whether the injury is entirely speculative or theoretical, and where the denial of a timely appeal was probably harmless, ex-

cept in the case of extraordinary dereliction on the part of the State the appropriate remedy is not discharge but such remedial steps as will permit the effective prosecution of an appeal.

*Id.* at Syl. Pt. 2. We elaborated on the issue of "extraordinary dereliction" in *Rhodes* by ruling that:

> Extraordinary dereliction on the part of the State sufficient to warrant unconditional release in a habeas corpus proceeding, where the relator's constitutional rights to an appeal have been violated, will largely depend on the facts of the individual case.
>
> Factors to be considered in determining whether there has been extraordinary dereliction are: the clarity and diligence with which the relator has moved to assert his right of appeal; the length of time that has been served on the underlying sentence measured against the time remaining to be served; whether prior writs have been filed or granted involving the right of appeal; and the related question of whether resentencing has occurred in order to extend the appeal period. While extraordinary dereliction on the part of the State does not require a showing of malice or ill will, certainly if such is shown it would be a significant factor.

160 W.Va. at 782, 239 S.E.2d at 138, Syl. Pts. 5 and 6.

Today we further address the issue of extraordinary dereliction in yet another context by examining whether a remedy exists for such dereliction once the appeal has been heard and found to be lacking in merit. The issue presented is as follows: If the grounds for habeas corpus relief center on the denial of an appeal, whether through the failure to provide effective counsel or a timely transcript, once the appeal has been heard and found to be without merit, is the defendant entitled to a remedy for any extraordinary dereliction in connection with the appeal process? We

think not. The Fourth Circuit Court of Appeals has previously arrived at this same conclusion in *United States v. Johnson,* 732 F.2d 379 (4th Cir.1984), *cert. denied,* 469 U.S. 1033, 105 S.Ct. 505, 83 L.Ed.2d 396 (1984). In *Johnson,* the court considered whether a two-year delay in preparation of the defendant's transcript, which might well have violated due process,[9] entitled the defendant to an unconditional release. The court reasoned that once "the appeal had been heard and found lacking in merit there is not any sound reason to order defendant's release." *Id.* at 382–83. The court noted that this type of due process violation need not go unremedied. Specifically, the court identified its supervisory powers over court reporters which includes the right to issue civil contempt orders as well as the court's power to grant writs of mandamus and other extraordinary relief. 732 F.2d at 383.

The failure of the defendant's first two lawyers to prepare and present his appeal in an effective and timely fashion was a profound dereliction of their duties as court-appointed attorneys. We do not find such a dereliction to have occurred in connection with the preparation of the trial transcript based on the state's representation that the defendant had in his possession a copy of the transcript by August 24, 1983, which was missing only the first portion of the prosecutor's closing which was later transcribed on November 27, 1989. Despite the abysmally deleterious conduct of at least two out of three of the defendant's attorneys in presenting his appeal, it is now clear that the defendant has suffered no prejudice from these delays based on the fact that his appeal has finally been presented, fully and effectively, but found to be without merit. We therefore adopt the rule enunciated in *Johnson* by holding that once a criminal defendant's appeal has been heard and found lacking in merit, notwithstanding possible due process viola-

---

9. The factors which the court identified in determining that the two-year delay in preparing defendant's transcript may have violated due process included the defendant's filing of all the forms necessary to obtain the transcript in a timely fashion, the defendant's efforts in press-ing his attorney to obtain the transcript, the attorney's communications with the court reporter, and finally the defendant's filing of a *pro se* petition for a writ of mandamus to obtain the transcript. *See Johnson,* 732 F.2d at 382.

tions arising from delays in transcribing the trial transcript or counsel's dilatory actions in perfecting the appeal, the defendant is not entitled to an unconditional release. In view of our holding, we need not determine whether the defendant's due process rights were violated or whether the state was extraordinarily derelict because we have already reviewed the appeal and found it to be without merit.

■ However, given the initial two and one-half year delay which occurred when defendant's trial counsel should have been diligently preparing the appeal, we feel compelled to address this issue by declaring that appointed trial counsel for an indigent criminal defendant who is convicted is required to continue representation of the defendant through the appeal process unless an order is entered relieving him of such obligation. When such appointed counsel is relieved of post-trial representation of the defendant,[10] the court shall im-

mediately appoint new counsel to represent the defendant on appeal unless the defendant chooses to retain other counsel, or affirmatively waives his right to appeal in open court on the record after consultation with competent counsel. The clerk of the circuit court which enters an order appointing counsel shall serve a certified copy of such order on the defendant and on new counsel.

For the reasons stated in this opinion, we hereby affirm the judgment of the Circuit Court of Cabell County and refuse to grant the writ of habeas corpus ad subjiciendum.

Affirmed; Writ denied.

---

**10.** On two separate occasions, once through the granting of a writ of habeas corpus and once through the granting of a writ of mandamus, this Court instructed the circuit court to appoint new counsel to represent the defendant. In the first instance, the "appointed" attorney claimed that he never received a copy of an order appointing him as counsel. In the second instance, the court waited for more than a month to even appoint new counsel. When, as in this case, the issue of appointing counsel to represent an indigent criminal defendant has been brought to the court's attention, the court has an affirmative obligation to promptly inquire into the matter and to oversee the appointment process to ensure that counsel has been notified of his or her appointment.